**Elizabeth KINNEY, Regional Director of the Thirteenth Region of the National Labor Relations Board, Petitioner–Appellant,**

v.

**PIONEER PRESS,**
**Respondent–Appellee.**

No. 88–3125.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 6, 1989.
Decided Aug. 7, 1989.

**486**

Joseph F. Frankl, Deputy Asst. Gen. Counsel, argued, Rosemary M. Collyer, Gen. Counsel, Harold J. Datz, Assoc. Gen. Counsel, Joseph E. Mayer, Asst. Gen. Counsel, and John W. Hornbeck, Deputy Asst. Gen. Counsel, Washington, D.C., for petitioner-appellant.

John A. McDonald, Keck, Mahin & Cate, Chicago, Ill., for respondent-appellee.

Before BAUER, Chief Judge, and EASTERBROOK and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

The General Counsel of the National Labor Relations Board believes that Pioneer Press ran afoul of several provisions of the National Labor Relations Act, 29 U.S.C. §§ 151–69, when it withdrew recognition of Local 71 of the Chicago Newspaper Guild, the union representing its production employees. The General Counsel issued three complaints against this and other of Pioneer's labor practices. An administrative law judge held a trial of these complaints on May 18–20, 1988, but has yet to reveal her decision.

Concerned that the union might wither while the administrative process lumbers to a conclusion, the Board authorized its Regional Director to petition the district court under § 10(j) of the NLRA, 29 U.S.C. § 160(j), for an injunction requiring Pioneer to bargain with Local 71 pending the NLRB's decision. The petition also sought relief on the other charges against Pioneer, which include interference with organizational rights and punishment of collective activity. The district judge, relying on *Squillacote v. Meat & Allied Food Workers*, 534 F.2d 735, 744 (7th Cir.1976) (*Meat Workers*), asked two questions: (1) Does the Director have "reasonable cause" to believe that Pioneer violated the NLRA?, and (2) Is injunctive relief "just and proper"? Answering "no" to both, she sent the Director away empty handed.

## I

Pioneer Press publishes suburban newspapers. The Guild has represented the production workers at Pioneer's Wilmette, Illinois, plant since 1977. The collective bargaining agreement was due to expire on January 21, 1988, but the parties agreed to extend it through February 11. This was about all they agreed on. Six bargaining sessions produced a standoff, and when the parties left the table on February 4, they couldn't even agree on a date for the next meeting.

The next day Pioneer received a bizarre document lambasting employees for tepid support of the union's bargaining proposals:

> We the Union Negotiators have agreed to propose a 0% pay increase for production personnel for the next 3 years. Without the support of the production personnel we have found that we dont have a leg to stand on. We have decided to suffer the consequences to make non-union members understand what we were fighting for all along *THEM*.
>
> If you have any comments you would like to be heard I would plan to attend the union meeting next Monday. If you dont have any comments I hope you will understand this contract has been given up as a loss. It seems the company has won this battle and we hope the next

contract we will have the support to put forth our proposals with the force we wish we had now. It seems the company has control of the whole process. It has been a definite no or a change of wording to everything we propose. They understand how much we are at a loss and they are taking total advantage of this fact.

All Union–Members must plan to attend this meeting. What we have to say will shock most but hopefully we will be able to show our reasoning. Its time to give up the Battle, lick our wounds and hope for another Battle that we can win at another time.

The Union Negotiators

Scrawled at the bottom were the time and place for a meeting. Pioneer's brass quickly circulated a memo to all employees outlining the company's latest offer—a 3% pay hike, effective immediately.

Apparently Pioneer's production employees didn't take kindly to being berated by their fellows. The February 8th meeting, poorly attended, was followed on the 9th by another, longer missive, again signed "The Union Negotiators":

TO: ALL EMPLOYEES

The Union had figured that money which is basically peoples livelihood would make people motivated enough to express some valuable opinions. Obviously we were wrong. People chose to believe that they could do better on there own. This time they may get there chance. A reminder, once the contract is terminated by the Company, everyones basic protections setup by the Union over the years will be void. The Union has no idea how the Company will deal with seniority, vacations, holidays, hours and overtime. When [Pioneer's Executive Vice President] Frank Santos was asked he did not know.

And so on. Management received a copy of this broadside shortly after announcing its intention to abandon the old agreement and implement its latest offer at midnight February 11th. Sensing from the two notices that the union was on the ropes, and knowing that only 29 of the 99 production

workers had dues withheld from their paychecks, Pioneer announced on February 18 that it would no longer bargain with the Guild. It said that it had good-faith doubt whether a majority of production employees still supported the union.

Having concluded that it didn't need to bargain, Pioneer proceeded as though it didn't need to tolerate cooperative activity of any kind. Flyers responding to Pioneer's actions were ripped from bulletin boards that the union had used to post messages. A union representative from the editorial ranks was threatened with disciplinary action for "non-editorial union activity". He'd been seen on March 3d handing out leaflets to production employees; he contends, and Pioneer denies, that the workers were on break at the time. The General Counsel issued complaints charging that Pioneer's acts violated §§ 8(a)(1), (3), and (5) of the NLRA, 29 U.S.C. §§ 158(a)(1), (3), and (5), and the Regional Director filed this suit seeking an injunction pending the Board's decision.

II

The Taft–Hartley Act, known formally as the Labor–Management Relations Act of 1947, Pub.L. No. 80–101, 61 Stat. 136, added § 10(j) to the NLRA. It provides:

> The Board shall have power, upon issuance of a complaint ... charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court ... for appropriate temporary relief or restraining order. Upon the filing of any such petition the court ... shall have jurisdiction to grant the Board such temporary relief or restraining order as it deems just and proper.

Before § 10(j) the anti-injunction provisions of the Norris–LaGuardia Act, 29 U.S.C. §§ 101–15, prevented courts from enjoining ongoing wrongs while the Board considered complaints of unfair labor practices. If the delay were long enough, or the sin grave enough, the Board's order might come too late to do any good. One or the other of the contending parties could be defunct.

The Taft–Hartley Act added to the Board's arsenal both § 10(j) and a related provision, § 10(*l*), 29 U.S.C. § 160(*l*). Although § 10(j) gives the Board the *discretion* to pursue interim relief against any unfair labor practice once a formal complaint is issued, § 10(*l*) *requires* the Board to seek a preliminary injunction whenever it has "reasonable cause" to believe that any of a small number of specified violations (such as secondary boycotts and certain illegal picketing) has occurred. Both came from the Senate version of what became Taft–Hartley, and the report spells out their purpose:

> Time is usually of the essence [in labor disputes], and consequently the relatively slow procedure of Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals, falls short of achieving the desired objectives—the prompt elimination of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining. Hence we have provided that the Board, acting in the public interest and not in vindication of purely private rights, may seek injunctive relief in the case of all types of unfair labor practices and that it shall also seek such relief in the case of strikes and boycotts defined as unfair labor practices.

S.Rep. No. 80–105, 80th Cong., 1st Sess. 8 (1947).

## A

The district court refused to issue an injunction, first finding that the Board lacked reasonable cause to believe that Pioneer had violated the NLRA, then concluding that injunctive relief is, in any event, "reserved for more serious and extraordinary circumstances than presented here." This sequential inquiry comes from *Squillacote v. Graphic Arts International Union*, 513 F.2d 1017, 1021 (7th Cir.1975) (*Graphic Arts I*):

> [T]he district court is not called upon to decide the merits.... The Board does this. The district court guided by equitable principles determines instead whether the Board has reasonable cause to believe [a violation has occurred]. If the court finds reasonable cause, it must grant whatever injunctive relief "it deems just and proper."

*Graphic Arts I* was a § 10(*l*) case, but *Meat Workers*, 534 F.2d at 743–44, said that district courts should approach § 10(j) petitions the same way. See also, e.g., *Szabo v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir.1989).

The district court examined the record developed before the administrative law judge and chose to credit Pioneer's witnesses, who had testified that the firm had a good faith doubt about the union's majority, rather than to accept the testimony of the union's officers and other evidence in the record, such as the fact that a majority of production employees recently had signed authorization cards. The Director believes that the court should not have weighed the evidence or drawn inferences; as she sees things, the court need only determine that the Board eventually *could* side with the General Counsel. Our decisions contain some language supporting this perspective: a legal theory that is "substantial and not frivolous" supplies reasonable cause, we have said, if the NLRB could believe the General Counsel's version of the facts. See *Squillacote v. Graphic Arts International Union*, 540 F.2d 853, 858 (7th Cir.1976) (*Graphic Arts II*).

But there has been anything but unanimity among the circuits on the question what it takes for the Director to demonstrate reasonable cause. Each court couches its standard in different terms, some using more than one formulation.[1] Our own at-

---

1. A sampling: *Fuchs v. Hood Industries, Inc.*, 590 F.2d 395, 397 (1st Cir.1979) (whether facts *could* be resolved in Director's favor by the NLRB); *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1031 (2d Cir.1980) (Friendly, J.) (sustain Director's version of the facts if rational; draw inferences in favor of Director); *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir.1980) (Newman, J.) (give the benefit of the doubt to Director on factual disputes); *Eisenberg v. Lenape Products, Inc.*, 781 F.2d 999, 1003 (3d Cir.1986) (view facts in light most favorable

tempt in *Graphic Arts II* to state an all-purpose standard for reasonable cause raises complicated questions. When the district court hears live testimony, instead of working from the administrative record, should it be entitled to assess credibility, even though the Board might evaluate the witnesses differently? If so, does "reasonable cause" have different meanings depending on the circumstances of a particular § 10(j) proceeding? If the district judge looks only to a paper record, and must give the Director the benefit of the doubt, the undertaking closely tracks the district court's consideration of a motion for summary judgment, where the court draws inferences in favor of the non-moving party and we review the legal issue *de novo*. But if the district judge hears testimony, the credibility of the witnesses may be crucial, indeed may convince the district judge that the Director's case is hopeless. It would be strange to ignore the district court's assessments of credibility under such circumstances, since our review of such matters is typically deferential. But it also would be odd to have the nature of appellate review vary in this way, for that would give the defendant a strong reason to insist on adducing testimony.

Perhaps the problem lies not in the details of "reasonable cause" but in thinking that the subject need be resolved in a suit under § 10(j). The words "reasonable cause" appear in § 10(*l*) but not § 10(j). The Board may invoke § 10(j) at its discretion whenever it believes someone has transgressed the NLRA, but may do so only after the General Counsel has filed an administrative complaint. Section 10(*l*), by contrast, is mandatory. It requires the Board to seek injunctive relief if an investigation yields "reasonable cause" to believe that secondary boycotts or other identified kinds of especially grave violations are in progress. The two sections operate differently: § 10(*l*) *commands* the Board to

seek an injunction whenever it has "reasonable cause"; § 10(j) *permits* the Board to pursue interim relief for any violation, but only after uncovering enough evidence to warrant the bringing of formal charges and in addition deciding that the case is sufficiently important to call for interim relief.

■ "Reasonable cause" is the trigger of the Board's duty under § 10(*l*). Because § 10(*l*) is mandatory, Congress had to establish the boundary of the Board's obligation. It would be silly to require the Board to seek an injunction whenever someone shouts "secondary boycott". Some preliminary investigation is essential. May the Board investigate so thoroughly that the disputants expire in the interim? Congress chose to require the Board to put the subject before a court as soon as it discovers "reasonable cause" to believe that one of the unfair labor practices named in § 10(*l*) is in progress. If the Board never turns up "reasonable cause", it need not start the judicial process. "Reasonable cause" under § 10(*l*) thus serves two functions: it requires the Board to investigate before filing suit, and it allows the Board to filter out claims of violations that do not justify litigation.

Section 10(j) has a different structure. This law never requires the Board to sue, and the Board may act on its own schedule. First the General Counsel investigates, often a time-consuming process. Only if the General Counsel files a complaint may the Board use § 10(j), and the Board has discretion to disdain this remedy no matter how strong the evidence. Having given the Board unfettered discretion not to sue under § 10(j), Congress did not need the threshold that "reasonable cause" represents under § 10(*l*); having told the Board not to file suit under § 10(j) until the administrative complaint has been lodged,

to Director); *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir.1988) (Director needs only "some evidence"; district court should not resolve conflicts if facts *could* support the Director's legal theory); *Graphic Arts II*, 540 F.2d at 858 (assume disputed facts in favor of Director if his view is within the range of

rationality); *Wilson v. Milk Drivers*, 491 F.2d 200, 203 (8th Cir.1974) (reasonable cause exists if there are disputed factual issues that must be resolved by the NLRB); *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 748 (9th Cir.1988) (accept Director's allegations if not insubstantial and frivolous).

Congress did not need to require any further minimum investigation.[2] Perhaps there are instances where the General Counsel files charges against an employer or union, the Board determines that interim relief is necessary under the circumstances and asks for an injunction, yet nonetheless the case is so thin that not even "reasonable cause" supports the Board's position. But Congress might rationally decide that the search for such instances is not worth the candle. If it had such a view, it would leave "reasonable cause" out of § 10(j) while putting that language in § 10(*l*)—which is what Congress did.

## B

Our doubts about the prevailing approach to § 10(j) have a source in addition to reluctance to treat statutes with distinct texts and functions as if identical. To force district courts to decide whether the Director had reasonable cause to pursue § 10(j) relief is to set out a task that, when completed, leaves the judge still facing the central question under § 10(j)—is injunctive relief "just and proper"? The energy expended by a district court on the reasonable cause question (the district judge below devoted more than 80% of her discussion to this issue) causes motion but not progress; the district court remains at square one on the crucial issue of the need for injunctive relief.

The embracing nature of this second inquiry saps the reasonable cause inquiry of moment—establishing that "reasonable cause" is the inquiry the Board must con-

duct, while courts employ their customary standards in suits seeking injunctions. Section 10(j) doesn't tell us what it means to say that relief is "just and proper", but we have no doubt that this phrase calls upon the district court to evaluate the propriety of the Director's request with an eye toward the traditional equitable principles that normally guide such an inquiry.[3] We recently held this to be true in suits for injunctive relief under the Federal Trade Commission Act, which is silent on the standards for granting or denying such relief. *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir.1989); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029–31 (7th Cir.1988). "[A]n injunction is an equitable remedy that does not issue as of course.... In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 1402–03, 94 L.Ed.2d 542 (1987). Deviations from this traditional equitable balancing exist, but are rare:

> Of course, Congress may intervene and guide or control the exercise of the courts' discretion, but we do not lightly assume that Congress has intended to depart from established principles.... "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."

*Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803–04, 72

---

**2.** Unless acting capriciously, the General Counsel would establish something like "reasonable cause" as the threshold for filing an administrative complaint. Nothing in the statute requires this, however, see 29 U.S.C. § 153(d), and courts do not review the General Counsel's exercise of prosecutorial discretion. *NLRB v. United Food & Commercial Workers*, 484 U.S. 112, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148, 95 S.Ct. 1504, 1515, 44 L.Ed.2d 29 (1975); *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967).

**3.** The party seeking preliminary injunctive relief normally must demonstrate (i) no adequate remedy at law, (ii) irreparable harm in the

absence of an injunction exceeding the irreparable harm the other side will suffer if the injunction issues, (iii) a reasonable likelihood of winning on the merits, and (iv) harm to the public interest stemming from the injunction that is tolerable in light of the benefits achieved by the relief. *West Allis Memorial Hospital, Inc. v. Bowen*, 852 F.2d 251, 253 (7th Cir.1988); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029–31 (7th Cir.1988). The district judge, in determining whether or not to grant the injunction, "must choose the course of action that will minimize the costs of being mistaken", all things considered. *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 593 (7th Cir.1986).

L.Ed.2d 91 (1982), quoting from *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946).

■ Section 10(j) tells the district court to do what's "just and proper", which we read as a statement that traditional rules govern—the approach emphasizing the public interest applied when the government is the plaintiff. *Meat Workers*, 534 F.2d at 744. We are not alone. See *Maram v. Universidad Interamericana de Puerto Rico, Inc.*, 722 F.2d 953, 958 (1st Cir.1983); *Silverman v. 40-41 Realty Associates Inc.*, 668 F.2d 678, 680 (2d Cir. 1982). The Director's likelihood of success on the merits thus *does* matter when it comes time to determine whether an injunction is "just and proper", just as it would matter under the antitrust laws (see *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984)) or the Federal Trade Commission Act (*Elders Grain*). The district judge must assess not only the harm that may go unchecked during the "notoriously glacial" course of NLRB proceedings, *Boire v. Teamsters*, 479 F.2d 778, 788 (5th Cir.1973), but also the probability that the General Counsel will succeed in convincing the NLRB that someone has in fact violated the labor laws. Grave harm times low likelihood of success may not add up to a conclusion that relief is "just and proper".

When courts apply traditional equitable principles to inquire whether an injunction is "just and proper" under § 10(j), no further purpose is served by asking the district judge, as a preliminary matter, to determine whether the Director has established reasonable cause. To the extent it is important, the inquiry is part of the analysis of whether injunctive relief is just and proper; if it doesn't fit into that analysis, it needn't be answered. The two questions, we have noted, "tend[ ] to merge". *Meat Workers*, 534 F.2d at 744. If the General Counsel's legal theory is inapt or if the facts are stacked against the agency's position (i.e., if there is truly no reasonable cause to believe someone has breached the NLRA), it's a safe bet that injunctive relief is not "just and proper". In fact, the district judge would be *required* to deny relief

under such circumstances, because an injunction may not issue unless the plaintiff has at least a modest chance of success on the merits. *Curtis v. Thompson*, 840 F.2d 1291, 1296-97 (7th Cir.1988). Because the district judge must consider the strength of the Director's case in order to make this decision, nothing is gained by engrafting onto § 10(j) proceedings a preliminary "reasonable cause" test.

District judges have plenty to do without our forcing them to jump through hoops for no good reason. So do we. Trying to sort cases into bins according to the presence or absence of "reasonable cause" has produced a complex body of law concerning standards of appellate review. Circuits have seen different nuances in the phrase, see note 1 above, producing disagreement about the appropriate standards of review. E.g., *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 747 (9th Cir.1988) (defer to a finding that the Director has reasonable cause, but review *de novo* a finding to the contrary); *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1086 (3d Cir.1984) (defer to the application of the facts to the Director's legal theory, but review *de novo* whether the theory is substantial); *Sheeran v. American Commercial Lines, Inc.*, 683 F.2d 970, 976 (6th Cir.1982) (district court's view of reasonable cause stands unless clearly erroneous); *Graphic Arts II*, 540 F.2d at 858-59 (defer to district court's decision absent an abuse of discretion). Limiting the "reasonable cause" inquiry to cases under § 10(*l*), where it serves principally as a requirement for the Board rather than the court, avoids the need to worry about standards of review.

## C

Courts are reluctant to overrule their decisions, especially when that would create a conflict among the circuits. Nonetheless, we have an obligation to give statutes their proper meaning rather than to perpetuate the effects of our own mistakes. *Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402, 409-10 (7th Cir.1989); *Bieneman v. City of Chicago*, 864 F.2d 463, 470-72 (7th Cir.1988); *Electrical Workers*

*v. Sign–Craft, Inc.,* 864 F.2d 499 (7th Cir. 1988); *Oxman v. WLS–TV,* 846 F.2d 448 (7th Cir.1988). When courts announce conclusions without examining the question, law can become a rumor chain, each case making slight variations in the last without anyone checking back on the source.

Consider *Meat Workers.* After reciting the language of *Graphic Arts I* concerning the standards under § 10(*l*), we added: "It has been held that the standards under subsections (j) and (*l*) are the same.... The courts are in general agreement that the district court must determine if the Board has reasonable cause to believe the act has been violated". 534 F.2d at 743–44. Conducting no independent analysis of the subject—nothing in the case depended on an analysis of "reasonable cause", so our views on this subject did not affect the judgment—we cited two cases that had "held" these things: *Danielson v. Garment Workers,* 494 F.2d 1230, 1242 (2d Cir.1974), and *Boire v. Teamsters,* 479 F.2d at 787 n. 7.

*Danielson* was a case brought under § 10(*l*), and the question whether § 10(j) contains a requirement of "reasonable cause" therefore was not before the court. Judge Friendly's opinion does not discuss the question. The reference in *Meat Workers* must have been to this passage, 494 F.2d at 1242 (citations and footnotes omitted, emphasis in original):

> This court has previously held that a district court should apply general equitable criteria when the Board seeks an injunction under § 10(j). Presumably those criteria would include some likelihood of success. Yet the only distinction between § 10(j) and § 10(*l*)—apart from the fact that the latter can be invoked before issuance of a complaint—is that under § 10(*l*) the Regional Director *must* apply once he "has reasonable cause to believe such charge is true and that a complaint should issue," whereas the Board's decision to apply under § 10(j) is left to its discretion. Nothing in the language of § 10(*l*) suggests any intention to prescribe a lesser role for the district court than under § 10(j).

This passage identifies the "reasonable cause" language in § 10(*l*) as one of two *differences* between the sections. The final sentence, denying that the district court has a "lesser role" in § 10(*l*) actions than in § 10(j) suits, responded to the Board's contention that if there is "reasonable cause" for suit under § 10(*l*), then the district judge *must* issue an injunction; the Second Circuit held, to the contrary, that under § 10(*l*) as under § 10(j) the district court must recur to "general equitable criteria". *Danielson* did not consider whether "reasonable cause" is an element of the Director's burden under § 10(j), and because it was a case under § 10(*l*) could not have done so.

*Boire v. Teamsters,* when introducing the legal standards, stated, 479 F.2d at 787 & n. 7 (emphasis in original):

> [G]uidance [on the meaning of the statutes] is readily available in the legislative history and judicial decisions under both § 10(j) and § 10(*l*).[7] Essentially, the relevant authority mandates two prerequisites before an injunction is appropriate. First, there must be some showing that the injunction is equitably necessary, and second, the Board must have "reasonable cause" to believe unfair labor practices are actually taking place.

---

[7] Section 10(*l*) of the Act provides that the Regional Director *shall* petition for temporary injunctive relief where he has reasonable cause to believe there are violations of the secondary boycott provisions of the Act. Unlike § 10(j), the Regional Director need not wait for the unfair labor practice complaint to issue; it is enough that reasonable cause to believe a violation exists and a complaint "should issue." For purposes of determining when a finding of "reasonable cause" should be reviewed the two sections are identical.

Footnote 7 of *Boire,* to which we referred in *Meat Workers,* accurately describes § 10(*l*) and mysteriously adds: "For purposes of determining when a finding of 'reasonable cause' should be reviewed the two sections are identical." What does that mean? The text of the opinion is clearer in equating the two sections but provides neither reasons nor authority. And as things turned out it didn't need to, because once again the disposition of the

case did not depend on the presence (or nature, if present) of a "reasonable cause" requirement in § 10(j). The Teamsters had asked the Fifth Circuit to hold that the Board could not establish "reasonable cause" if it were relying on an untried legal theory. Properly rejecting the argument that legal novelty eliminates the Board's access to the district court, see 479 F.2d at 789–92, the Fifth Circuit did not need to imbue "reasonable cause" with any content—and it did not.

 We have not found any case in which a court of appeals discussed reasons pro and con why § 10(j) should (or shouldn't) be treated as containing a requirement of "reasonable cause". Perhaps more importantly, we did not find a case in which the presence or absence of "reasonable cause" made a difference. Our latest decision fits the mold, observing that the "issue of reasonable cause ... is not before us because [the employer] does not appeal the district court's finding on this issue." *P\*I\*E Nationwide*, 878 F.2d at 209. No surprise. There can't be many cases in which an injunction is "just and proper" but the Board lacked "reasonable cause" to file a complaint. Logically the only cases in the set "injunction just and proper, but no reasonable cause" are those in which the Board acts precipitously in filing suit, but the record later developed supplies the basis missing at the outset. It is wasteful to throw out of court cases in which the Board, though acting improvidently at the time it decided to sue, nonetheless built a record adequate to require issuance of an injunction. Such cases could be re-filed instantly with "reasonable cause". Cf. *Newman–Green, Inc. v. Alfonzo–Larrain*, —— U.S. ——, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989). Because the search for cases in which reasonable cause is missing is a pointless expenditure of the court's (and the parties') time, we disavow the language in earlier cases that equated § 10(j) and § 10(*l*). Once the Board seeks injunctive relief under § 10(j), the only question for the court is whether the Board has demon-

strated that relief is "just and proper" under the approach traditionally applied to equitable cases filed by public agencies.[4]

### III

 The district judge devoted the bulk of her attention to "reasonable cause" and only one page to the question whether an injunction is appropriate in this case. That decision is reviewed for abuse of discretion, *Roland Machinery Co.*, 749 F.2d at 384–91, which is to say reviewed to see whether it depends on faulty legal premises, clearly erroneous factual findings, or improper application of the criteria governing preliminary injunctive relief. *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir.1986).

The district court began its consideration by writing: "Even if ... Pioneer Press engaged in unfair labor practices, injunctive relief is not appropriate in this case." This flowed from the court's belief that "[s]ection 10(j) is reserved for more serious and extraordinary circumstances than presented here." Yet no rule of law limits injunctive relief to "serious and extraordinary circumstances". Doubtless the Board should take the gravity of the circumstances into account when deciding whether to file a petition under § 10(j). Once the Board invokes judicial processes, however, the court must apply the standard rules in suits by public agencies rather than attempt to exercise the Board's prosecutorial discretion. Whether to commit resources to an effort to obtain interim relief in this case as opposed to some other is the Board's call. If Pioneer has wrongly refused to recognize and bargain with Local 71, is ripping down union communications and punishing its workers for union-related activities, the court should enjoin these activities. See *American Hospital Supply*, 780 F.2d at 593–94.

 Perhaps the district judge doesn't think the Director has much of a case, or is sanguine about the union's ability to hang on even if the charges against Pioneer are true. As we said in *P\*I\*E Nationwide*,

---

4. For reasons explained in the text, this conclusion does not conflict with any holding of this or any other court of appeals. Nonetheless, because it is a departure from the language of

many opinions, we have circulated the opinion to all active circuit judges under Circuit Rule 40(f). No judge in regular active service requested a hearing en banc.

878 F.2d at 209. an injunction under § 10(j), like all injunctions, is an "extraordinary remedy" that should be "granted only in those situations in which effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." Failure to establish irreparable injury and probability of success on the merits dooms any request for an injunction. The district court's opinion in our case does not reach this conclusion—at least does not lay out the necessary findings in the way Fed.R.Civ.P. 65(d) requires. Although the court gave several permutations on the bottom line,[5] it did not spell out factual findings or a legal rationale behind these conclusions. We therefore remand this suit to the district court for a fresh analysis of the Board's case under the traditional standards used in injunctive cases filed by public officials, which we recently addressed in *Elders Grain* and *World Travel Brokers*.

VACATED AND REMANDED.

---

**5.** "The Board has failed to show the necessity for court intervention." "The Board's vague predictions of irreparable injury to employee's rights are not sufficient." "There is no evidence that the NLRB's normal processes are inadequate to resolve this labor dispute and that an injunction is necessary."