Ronald M. SHARP, Regional Director of the Eighteenth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ASHLAND CONSTRUCTION COMPANY, Inc., Respondent.

No. 01–C–0036–C.

United States District Court, W.D. Wisconsin.

Feb. 26, 2002.

David M. Biggar, Menneapolis, MN, for petitioners.

John H. Zawadsky, Reinhart, Boerner, Van Deuren, Madison, WI, for respondent.

## OPINION AND ORDER

CRABB, Chief Judge.

■ Petitioner Ronald M. Sharp has brought this proceeding on behalf of the National Labor Relations Board pursuant to the National Labor Relations Act, 29 U.S.C. §§ 141–187. Petitioner is asking for a preliminary injunction pursuant to § 10(j) of the act, 29 U.S.C. § 160(j), which authorizes federal district courts to grant the board temporary relief upon a petition charging that any person has engaged in an unfair labor practice. Section 10(j) relief is a form of extraordinary relief, to be awarded "only in those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." *Szabo v. P\*I\*E Nationwide, Inc.,* 878 F.2d 207, 209 (7th Cir.1989).

In this proceeding, petitioner is charging that respondent Ashland Construction Company, Inc. has engaged in a number of unfair labor practices in response to the organizing activity of the International Union of Operating Engineers, Local Union 139, AFL—CIO. Petitioner seeks as relief an order enjoining respondent temporarily from engaging in certain prohibited practices, directing respondent to reinstate a laid-off employee and requiring respondent to recognize and bargain with the union on an interim basis. Respondent denies that it engaged in any unfair labor practices and opposes petitioner's efforts to obtain an injunction against similar practices on the ground that petitioner has shown only a negligible likelihood of prevailing on the merits and no need for injunctive relief. Moreover, respondent argues, an interim bargaining order would impose union representation on employees who lost their interest in such representation as a result of the union's conduct during the organizing campaign.

I conclude that petitioner has a better than negligible chance of prevailing on the merits of his complaint, that the unfair labor practices charged in the complaint pose a threat of irreparable harm to the union that outweighs the harm that interim relief poses to respondent, that interim injunctive relief is in the public interest and that, therefore, the interim injunctive relief that petitioner has requested is just and proper.

From the findings of fact proposed by the parties and the administrative record of the hearing before Administrative Law Judge Richard Miserendino, I find the following facts for the sole purpose of deciding petitioner's request for preliminary injunctive relief.

## FACTS

### A. *Background and Parties*

Petitioner Ronald Sharp is Regional Director of the Eighteenth Region of the National Labor Relations Board, an agency of the United States. At all relevant times, respondent Ashland Construction Company, Inc. has maintained an office and place of business in Ashland, Wisconsin. It is engaged in providing sand and gravel delivery and excavation and road construction services.

On four occasions between September 10, 2001 and December 20, 2001, the International Union of Operating Engineers, Local Union 139, AFL—CIO, filed charges with the Board, alleging that respondent had engaged in unfair labor practices. The Board conducted a field investigation and then issued a complaint and other documents, alleging that respondent had engaged in unfair labor practices and was continuing to do so. An evidentiary hearing was held on January 8–10, 2002, before Administrative Law Judge Richard Miserendino.

Petitioner has reasonable cause to believe that in calendar year 2000, respon-

dent derived gross revenues in excess of $500,000 and purchased and provided services valued in excess of $50,000 to customers of its sand and gravel delivery, excavation and road construction business who are located within the state of Wisconsin; the Union has been a labor organization within the meaning of 29 U.S.C. § 152(5); and William Kacvinsky has been the owner of respondent and Ralph Mashlan has been a supervisor of respondent within the meaning of § 152(11).

### B. *Events Preceding Administrative Hearing*

In late May 2001, union organizer Neil Adler called one of respondent's employees, David Lucius, to test the waters for an organizing campaign. Tr. 106. Adler met with employees Peter Raspolic, Michael Wittling and Mark Freeman in Ashland on June 14 and obtained authorization cards from them, authorizing the union to be their bargaining representative. Tr. 107–09. By June 15, 2001, 15 of the 17 employees in the unit had signed authorization cards. Another signed by July 6. Pet.'s Exhs. 2, 3, 4, 26–29, 36–38.

On June 28, 2001, Neil Adler talked with Ralph Mashlan at length about the union's efforts to organize respondent's employees.

On or about July 6, 2001, Adler handed out white union baseball caps to the employees. Tr. 123. William Kacvinsky observed employees wearing the hats and asked employee Peter Raspolic what was going on with the union hats. He told Raspolic that if he thought they "were going to do that here," they were "in for a fight because they tried to do this to me before and it almost broke me." Tr. 197. On or about July 6, 2001, Kacvinsky interrogated employee Mike Wittling about the source of the union hats and whether the union organizer had been at respondent's shop. Tr. 349–51. During the same conversation, supervisor Ralph Mashlan gave

Wittling an impression of surveillance by telling Kackvinsky in front of Wittling that Raspolic was the supposed union instigator. Tr. 349. Kacvinsky's response was to say in front of Wittling that he (meaning Kacvinsky) had "sure screwed up on that Pete deal." Tr. 350. Kacvinsky asked Wittling whether Wittling's brother could come and work full time for respondent because Kacvinsky was getting rid of someone. *Id.*

On or about July 8, 2001, Kacvinsky visited employee Duane Garz at his home and told him he would receive a substantial raise and asked him not to tell other employees about it. Tr. 69, 605. At the hearing before the administrative law judge, Kacvinsky testified that he had not realized until that spring that Garz was not making as much money as other employees who had not been with the company as long as Garz. Tr. 504. On or about July 12, 2001, respondent gave large wage increases to selected employees. Tr. 43, 455–56.

On or about July 9, 2001, respondent's employees held a meeting to choose a date to demand recognition from respondent. Tr. 133. That same day or the day before, Kacvinsky had been hospitalized for a possible heart attack and employees Raspolic, Josh Zepczyk, Carl Garz and Blake Ellefson had been laid off. Tr. 132. At the meeting, Oscar Reiten told employees that he had spent the better part of the day with Kacvinsky at the hospital and that respondent would reduce its hours or close its business if the employees selected the union as their bargaining representative. Tr. 133, 357, 375. Reiten told the employees that they would be getting a raise of between $.50 and $1.00. Tr. 356. Reiten made it clear to the employees that the reason Raspolic was not working was because of his organizing efforts. Tr. 133, 202, 261. He said to Raspolic, "We all

know why you're not working, Pete. It isn't because we don't have work." Tr. 133. The employees decided to put the demand for recognition on hold until they knew more about Kacvinsky's health. Tr. 133–34.

On or about July 12, 2001, Ralph Mashlan accused employee Josh Zepczyk of disloyalty because of Zepczyk's union organizing activities. Tr. 266. Mashlan told Zepczyk to think about the organizing efforts and then look at who signed the employees' pay checks. Tr. 266, 268. When Zepczyk said that he was concerned about not having any insurance, Mashlan said he would check with Kacvinsky's secretary about getting him health insurance benefits. Tr. 267. The next day, Kacvinsky's secretary talked to Zepczyk about health insurance, Tr. 279, although her usual policy was to wait until employees came to her to ask about health insurance. Tr. 436.

On or about July 16, 2001, Kacvinsky interrogated employee David Lucius about Lucius's organizing activities and that of other employees. Tr. 378. In the same conversation, Kacvinsky solicited grievances from Lucius and suggested to him that employees would receive benefits if they abandoned their organizing effort. Tr. 378.

On or about July 16, 2001, Kacvinsky implied to employee Peter Raspolic that Raspolic had been guilty of disloyalty for engaging in organizing activities. Tr. 205. Kacvinsky threatened to cease doing business if the organizing effort was successful. Tr. 205–06. In the same conversation, Kacvinsky implied that employees would have received benefits if they had dealt with him directly. Tr. 205.

On or about July 20, 2001, Raspolic and about ten or twelve other employees went to Kacvinsky's office early in the morning and read him a letter demanding recognition of the union. Tr. 211–12. Kacvinsky got up and left the room. Tr. 212. Ras-

polic continued to read, then handed the letter to Kacvinsky, who put it into a manila envelope and gave it to the union organizer, Neil Adler. Id. Kacvinsky then ordered Raspolic to leave respondent's facility, in retaliation for the employee's organizing activities and support of the union, Tr. 81, 213, 270, saying, "You're lower than a snake. I don't believe you did this. I thought you had a better upbringing than that." Tr. 213. Kacvinsky told Raspolic, "You can get out of here. I don't care if I never see you." Tr. 81, 213, 270.

On or about July 20, 2001, Kacvinsky interrogated Josh Zepczyk about the union's organizing efforts and whether Zepczyk supported them. Tr. 270. Id. In the same conversation, Kacvinsky reminded Zepczyk that Kacvinsky had given him his job. Id.

On or about July 20, 2001, Kacvinsky visited a job site and solicited employees to revoke their union authorization cards. Tr. 271–72. While talking to the employees about their authorization cards, Kacvinsky told them they would be much better off if they signed the letter revoking the authorization cards rather "than the one the Union made [them] sign." Tr. 274. On or about the same day, respondent laid off employee Doug Borman. Tr. 312–13.

On or about August 10, 2001, Kacvinsky told Mike Wittling that he would like to sit down with Wittling and other employees about making things better for them at the company, implying that employees would receive benefits if they dealt with Kacvinsky directly. Tr. 361. Kacvinsky told Wittling that if he was unhappy working for respondent, he should go work somewhere else. Id.

Although respondent cited lack of work for the June 8 or 9 layoffs of Ellefson, Raspolic, Garz and Zapczyk, it recalled all of the laid off employees except Raspolic two days later. Tr. 263, 623. Respondent

hired Greg Provost to help employee Brad Gustafson set grade. Tr. 570. Provost did not do any take-out work. *Id.*

In about November 2001, respondent implemented a new policy that winter season work would be assigned to employees by seniority and employees would not be permitted to decline winter season work either to permit less senior employees the opportunity to work or to allow employees to opt for unemployment during the winter season. Tr. 99–100, 386–87, 650–51. On or about November 26, 2001, Kacvinsky told employees that decisions on who would work during the winter and who would be laid off until spring were changed from prior years. Tr. 387–88. On November 26, 2001, respondent denied David Lucius winter snowplowing work. Tr. 386–88. On or about the same day, respondent laid off three employees. Tr. 386–87.

Although the union asked respondent to recognize it as the exclusive collective bargaining representative of the unit at the July 20, 2001 meeting with Kacvinsky at respondent's Ashland facility, Tr. 80, 140–41, respondent has refused to recognize the union as the exclusive collective bargaining representative of the unit. When respondent implemented its new winter work policy, it did so without prior notice to the union and without affording the union an opportunity to bargain with respondent with respect to this conduct and its effects.

## OPINION

■ The purpose of bringing a § 10(j) petition is to prevent the potential frustration or nullification of the National Labor Relations Board's remedial authority that could be caused by the passage of time required to complete the administrative proceedings. *Kinney v. Pioneer Press,* 881 F.2d 485, 493–94 (7th Cir.1989). Respondent argues that this case presents no urgency because the parties have asked for expedited treatment by the administrative law judge. If the administrative law judge's decision were the last stage of the administrative process, respondent's argument might have some force. The truth is, however, that the entire proceeding will not be complete until the Board has had a chance to review the administrative law judge's decision. Of necessity, that review will add additional months to the process.

■ Despite respondent's objections, it is necessary to decide the § 10(j) petition. The relevant considerations are the same as those involved in assessing any other request for preliminary injunctive relief: the lack of an adequate remedy at law, the balance of potential harms posed by the grant or denial of the relief requested, the public interest and the petitioner's likelihood of succeeding on the merits of the complaint. *Bloedorn v. Francisco Foods, Inc.,* 276 F.3d 270, 286 (7th Cir.2001) (citing *Pioneer Press,* 881 F.2d at 490 & n. 3, 493).

### 1. *Likelihood of success*

■ A number of factors make it likely that both the administrative law judge and the Board will find in petitioner's favor. First, many of the alleged unfair labor practices are blatant. Second, most of them are attributable directly to Kacvinsky, respondent's president, and not merely to some lower level supervisory employee. Third, respondent has admitted some of the worst violations. For example, it does not deny that Kacvinsky ordered employee Peter Raspolic from the company's property, told him never to return and referred to him in derogatory terms within minutes after Raspolic led a group of employees into Kacvinsky's office to present a letter demanding recognition. Respondent does not deny that Kacvinsky gave two employees large raises and gave another one insurance benefits, although it por-

trays these actions differently from the way that petitioner paints them. (Kacvinsky testified at the administrative hearing that he had not been aware of a large discrepancy between Duane Garz's wages and his peers' but that testimony lacks credibility in light of the small size of the company and Kacvinsky's statement that he personally approves all wage increases. Also, there is evidence that respondent's usual practice was to give all employees the same wage increase. In two cases in which single employees were given larger increases than others, the increases came in the form of a second wage increase during the year rather than in the form of a larger increase at one time.) Fourth, there is corroboration of many of the allegations made against respondent. More than one employee was party to the same kinds of threats or the promises of benefits that Kacvinsky made that were conditioned on the employees' abandoning their organizing efforts.

Respondent argues vigorously that many of Kacvinsky's actions and statements have innocent explanations. For example, respondent adduced evidence of potentially innocent explanations for not calling Peter Raspolic back to work: a customer had complained about work he had done on a job site; he had failed to call to inquire about work; and respondent's efforts to locate him to recall him had been unsuccessful. Respondent asserts that it was legal for Kacvinsky to throw Raspolic off respondent's property on the day that he read the letter to Kacvinsky demanding union recognition because Raspolic was not legally entitled to be on the property at that time. Respondent explains its layoff of Raspolic and the others by saying that there was not enough work.

Respondent asserts that Kacvinsky did not know about the union organizing before July 6, 2001. I suspect the Board will find this assertion implausible, given the small size of the company, the active participation of all but one of the members of the bargaining unit and the fact that union organizer Adler talked to supervisor Mashlan at length on June 28 about his efforts to organize respondent's employees. I suspect that it will view Kacvinsky's explanation for the back-dated wage increases as equally implausible.

Respondent's story about lacking work does not ring true. Not only did it hire replacement workers to do work that Raspolic could have done, such as the laborer work that Greg Provost performed, but it subcontracted more business than usual in the summer of 2001. (Respondent argued that Provost performed take-out work that Raspolic could not have done. Gustafson, Provost's supervisor, said that Provost performed no such work.) Moreover, respondent recalled three of the four employees it laid off on July 8 or 9, leaving only Raspolic, the most visible union supporter, still at home.

It is not necessary to find that Oscar Reiten was respondent's agent when he purported to speak on Kacvinsky's behalf at the July 9, 2001 meeting. Even without taking Reiten's statements into consideration, I am satisfied that petitioner has significantly more than a negligible chance of establishing that respondent's president threatened employees and promised them benefits in an effort to interfere with the exercise of their rights under the National Labor Relations Act. 29 U.S.C. § 158(a)(1).

2. *Adequate remedy at law and balance of harms*

If the administrative law judge and Board accept petitioner's evidence, their conclusion will be that respondent has engaged in a number of unfair labor practices that have stymied its employees' legitimate efforts to organize. Leaving

those practices uncorrected and undeterred will undermine those efforts irreparably. Few employees would retain their enthusiasm for the union after seeing their fellow employees fired or laid off when they could be working and treated differently with respect to winter work. The longer these hostile conditions exist, the more difficult it will be for the union to organize respondent's employees. The Board's ability to rectify the harm diminishes with time, while the employees continue to be deprived of the union representation they wanted initially. *NLRB v. Electro–Voice*, 83 F.3d 1559, 1573 (7th Cir. 1996). The Board and the employees it represents have no adequate remedy at law.

Granting interim relief to petitioner will impose no burdens on respondent that it would not have incurred had it acted lawfully during the organizing effort. It is not being asked to fire employees it hired to replace persons it discharged or refused to hire. *Cf. Francisco Foods, Inc.*, 276 F.3d at 299 (reinstating job applicants that employer did not hire held possibility of displacing current employees). The balance of harms is decidedly in petitioner's favor.

### 3. *Public interest*

■ In a § 10(j) proceeding, the interest at stake is "the public interest in the integrity of the collective bargaining process." *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906–07 (3d Cir.1981) (quoted in *Francisco Foods, Inc.*, 276 F.3d at 300). The public has an interest in protecting the collective bargaining process from coercive unfair labor practices.

### 4. *Injunctive relief*

■ A court must consider the justness and propriety of ordering interim injunctive relief in a § 10(j) proceeding. That task is made easier when, as in this case, the petitioner is shown to have a strong chance of succeeding on the merits of his charge. Respondent argues that anything more than relief in the form of a cease and desist order would be improper, because it was the union's conduct during the bargaining process that caused the employees to lose their interest in a union rather than respondent's threats and promises. Given respondent's conduct during the organizing period, respondent's assertion is implausible.

As of June 15, 2001, a majority of the employees in the bargaining unit had designated and selected the union as their representative for the purposes of collective bargaining. That was the situation before respondent engaged in its unfair labor practices. It is the status quo that should be preserved during the period in which the administrative proceedings are taking place, not the illegal status quo that resulted from respondent's actions. *See Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir.1975), *cited with approval in Electro–Voice, Inc.*, 83 F.3d at 1575.

Merely entering a cease and desist order would not effectuate employees' rights pending a determination by the Board. Instead, it would merely inform respondent not to continue to engage in the prohibited behavior after the behavior has had its desired effect of scaring off employees from organizing activities. I conclude, therefore, that the injunctive relief requested by petitioner should be granted.

### ORDER

IT IS ORDERED that respondent Ashland Construction Company is temporarily enjoined form:

(1) Any act or conduct interfering with, restraining or coercing any of its employees in the exercise of their rights guaranteed under Section 7 of the National Labor Relations Act, as amended, which rights

are as follows: To engage in self-organization; to form, join or assist labor organizations; to bargain collectively through representatives of their own choosing; to act together for purposes of collective bargaining or other mutual aid or protection; or to refrain from any or all such activities, except to the extent that such right might be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized by Section 8(a)(3) of the National Labor Relations Act, as amended.

(2) Creating the impression of surveillance of employees' activities on behalf of the union.

(3) Soliciting or resolving grievances from employees in order to discourage employees' activities on behalf of the union.

(4) Accusing employees of disloyalty to the employer because of their activities on behalf of the union.

(5) Threatening employees that supported the union that they should leave their employment.

(6) Threatening employees that their organizing efforts will prove futile.

(7) Threatening employees that the employer should have terminated the employee whom they viewed as leading the union organizing efforts.

(8) Threatening to lay off employees because of their organizing activities.

(9) Making derogatory remarks about union officials or about employees viewed as sympathetic to the union organizing.

(10) Threatening employees that the employer will never recognize the union as the exclusive bargaining representative of employees.

(11) Threatening employees that it will cease doing business if employees succeed in their union organizing efforts.

(12) Threatening employees that they must leave the employer's facility and never return, because of their support for the union.

(13) Threatening employees by implying that they will receive greater benefits if they abandon their support for the union.

(14) Interrogating employees about their support for the union.

(15) Promising employees benefits in order to undermine their support for the union.

(16) Granting benefits to employees in order to undermine their support for the union.

(17) Terminating employees because they engage in activities in support of the union and in order to discourage other employees from supporting the union.

(18) Telling employees they would have received better benefits if they had dealt directly with the employer instead of talking to the union.

(19) Laying off employees because they engage in activities in support of the union and in order to discourage other employees from supporting the union.

(20) Soliciting employees to abandon their support for the union by revoking their authorization for union representation.

(21) Refusing to recognize and bargain with the union as the exclusive collective bargaining representative of the appropriate unit described as follows:

All full-time and regular part-time employees employed by Ashland Construction Company, Inc., at or out of the Ashland, Wisconsin facility, excluding office clerical employees, and guards and supervisors as defined by the National Labor Relations Act, as amended.

(22) Unilaterally laying off or changing wages or other terms and conditions of employment of the employees in the unit described above without prior notice to the

union and without affording the union an opportunity to negotiate.

FURTHER, within five days of the issuance of this order, or as soon as hiring begins in the spring of 2002, respondent is directed to make a written offer of employment to Peter Raspolic, to be effective immediately at its operation in Ashland, Wisconsin, to return to his former job and conditions of employment as of July 20, 2001, displacing or discharging if necessary any workers reassigned or hired to replace him or if such position no longer exists in a substantially equivalent position, without prejudice to his seniority or other rights and privileges he enjoyed previously;

Respondent is directed to recognize and, if requested by the union or its agents, bargain in good faith with the union as the exclusive collective bargaining representative of the unit employees at respondent's facility in Ashland, Wisconsin, concerning their wages, hours, and other terms and conditions of employment;

Respondent is directed to post copies of this opinion and order at its Ashland, Wisconsin facility at all locations in which notices to employees are customarily placed. The postings shall be maintained during the Board's administrative proceedings free from all obstructions and defacements and the agents of the Board shall be granted reasonable access to respondent's Ashland, Wisconsin facility to monitor compliance with this posting requirement;

Respondent is directed to grant agents of the National Labor Relations Board reasonable access upon request to all of respondent's hiring records for examination and reproduction, to permit monitoring of respondent's compliance with the terms of this order; and

Within twenty days of the issuance of this order, respondent is directed to file a sworn affidavit from a responsible company official setting forth with specificity the manner in which respondent has complied with the terms of this order.