In the
United States Court of Appeals
for the Seventh Circuit

No. 00-1860

PHILIP E. BLOEDORN, Regional Director
of Region 30 of the National Labor Relations
Board, for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

Plaintiff-Appellant,

v.

FRANCISCO FOODS, INC.,
d/b/a PIGGLY WIGGLY,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99 C 1402--Rudolph T. Randa, Judge.

ARGUED SEPTEMBER 21, 2000--DECIDED DECEMBER 28, 2001


Before ROVNER, DIANE P. WOOD, and WILLIAMS, Circuit Judges.

ROVNER, Circuit Judge.  Until 1999, the employees of the Piggly Wiggly grocery store in Ripon, Wisconsin, were represented by the United Food and Commercial Workers Union, Local No. 73A, AFL-CIO-CLC (the "Union"). When the owner of the store announced his intent to sell the franchise to Francisco Foods, Inc. ("FFI"), FFI invited store employees to submit applications to work for the new owner. Fewer than half of the employees that joined the FFI workforce had previously worked for the prior owner, however, so that when the store reopened under FFI's ownership, a majority of the store's employees were not Union members and consequently FFI was not obliged to recognize and bargain with the Union.

The Regional Director (the "Director") of the National Labor Relations Board (the "NLRB" or the "Board") filed an administrative complaint charging that FFI had deliberately refused to hire a number of people who had worked for the store's previous owner in order to avoid having to bargain with the Union, in violation of section 8(a)(1) and (3) of the National Labor Relations Act (the "Act"), 29 U.S.C. sec. 158(a)(1), (3). The Director also asserted that FFI's refusal to recognize and bargain with the Union, and its failure to adopt and enforce the terms of the collective bargaining agreement that the Union had entered into with FFI's predecessor, constituted unfair labor practices that were contrary to section 8(a)(1) and (5) of the Act, 29 U.S.C. sec. 158(a) (1), (5). While the complaint was pending before an administrative law judge, the Director filed this action seeking interim injunctive relief pursuant to section 10(j) of the Act, 29 U.S.C. sec. 160(j). Specifically, the

Director asked the district court to enter an order requiring FFI to offer employment to the employees of the prior owner that FFI had refused to hire, to recognize and bargain with the Union, and to restore employee working conditions (including wages and hours) to their state prior to FFI's takeover of the store, until such time as the Director's complaint was finally resolved by the Board. The district court denied the Director's request, concluding that he was unlikely to prevail on the merits of the complaint and that he had not established the prospect of irreparable harm to the Union. R. 23.

The Director appeals the denial of his request for interim relief. Because we conclude that the Director has a "better than negligible" chance of prevailing on the merits of his complaint, that the unfair labor practices charged in the complaint do pose a threat of irreparable harm to the Union which outweighs the harm that interim relief poses to FFI, and that interim injunctive relief is in the public interest, we reverse the district court's judgment.

I.

We have derived the factual summary that follows from the record of the evidentiary hearing conducted before the Board's administrative law judge ("ALJ") on the Director's complaint. The Director submitted the record of that hearing to the district court in support of his petition for interim relief.

For more than twenty-five years prior to 1999, the Union represented all non-supervisory employees of the Piggly Wiggly store in Ripon. Ripon Supermarkets, Inc. ("RSI") owned the Piggly Wiggly franchise in the years immediately preceding the events underlying this action; Ron and Carol Bayer were the principals of RSI. The final collective bargaining agreement entered into by RSI and the Union covered the period beginning on February 1, 1996 and ending on January 31, 1999. General Counsel Exhibit ("GC Ex.") 2. However, in the final days of January 1999, RSI and the Union agreed to extend the term of this agreement until such time as they entered into a new contract. GC Ex. 3. The 1996 agreement contained no successor clause requiring anyone who purchased the store from RSI to recognize the Union.

Pam Francisco had worked at the Ripon Piggly Wiggly for twenty-five years and had served as the store manager for the last six and one-half years prior to 1999. When the Bayers decided to sell the store, Francisco and her husband Tom formed FFI for the purpose of buying the store. (Francisco is the president and secretary of FFI.) FFI and RSI entered into a purchase and sale agreement on March 10, 1999. GC Ex. 11. Because the final collective bargaining agreement between RSI and the Union contained no successor clause, FFI would not be required to recognize the Union if a majority of its employees were not already members of the bargaining unit--i.e., if they had not worked for RSI./1

On March 12, 1999, Ron Bayer informed Grant Withers, the Union's business representative, that he was selling the Piggly Wiggly to Francisco. Bayer asked Withers to keep this information under his hat for a few days until Bayer had a chance to announce the sale to store employees. Three days later, on March 15,

Withers telephoned Francisco to follow up on Bayer's disclosure. According to Withers' notes of the conversation, the following exchange took place:

Withers: Have you and Ron informed the employees yet?

Francisco: Yes, we did.

Withers: Well Pam, the reason I'm calling is I'd like to know if you would be available for a meeting tomorrow[.]

Francisco: No, I have two appointments already.

Withers: Well Pam, we need to know what your intentions are as far as recognizing the Union[.]

Francisco: At this time, I don't think we[']re going to.

Withers: Really? Are you sure?

Francisco: I may let my new employees decide what to do.

Withers: By your statement, "my new employees," am I to assume you won't be keeping the current employees?

Francisco: No, I'm not going to keep the bargaining unit.

Withers: Is this for sure or would you like a few days to think about it?

Francisco: No, at this point, I'm sure.

Withers: Well that's unfortunate. I'm sure Ron could tell you, and you probably recall, how much the turmoil cost Ron in business when he bought the store [--] sales that he never recovered. That is unfortunate[.] I'm sure you understand that we'll have to take whatever action we need to, to protect these jobs.

Francisco: Sigh.

Withers: Okay, Bye.

GC Ex. 4. In her own testimony, Francisco acknowledged telling Withers that "I was taking a new direction and there would be a lot of new faces," but she denied saying anything about whether she would retain RSI's employees, recognize the Union, or assume the collective bargaining agreement. Tr. 72; see also Tr. 633-35.

According to assistant store manager Michael Ritchay, Francisco likewise told him on March 15 that "she was going around to the people that she wanted to hire and . . . it wouldn't be a union . . . ." Tr. 432-33. Joann Schrader, manager of the bakery/deli section of the store, recalled Francisco remarking that same day, at a meeting of store managers and other employees, "that not everyone would be hired back." Tr. 340.

In a letter dated March 16, 1999, one day after and apparently in reference to Withers' conversation with Francisco, FFI's attorney, James Macy, wrote the following letter to Withers:

This letter is to notify you that we represent Francisco Foods, Inc., and are assisting them in regards to the transition and purchase of the Piggly Wiggly store in Ripon, Wisconsin. As noted by Ms. Francisco, they anticipate considerable changes in regards to the operation of this store upon the completion of this asset purchase. In that regard, the Company does not anticipate assuming the collective bargaining agreement.

While disappointed in your initial comments to the Company, we do anticipate a positive and professional transition. We respectfully request that if you have any further questions in regards to this transition, you direct them to our attention.

GC Ex. 5.

Also on March 16, Bayer and Francisco each posted notices at the store formally advising employees of the forthcoming sale. Bayer's notice read as follows:

This posting is to advise you that effective May 15, 1999, the entire assets of [the] Piggly Wiggly store operated by Ripon Supermarket Inc. at 111 E. Fond du Lac St., Ripon, Wisconsin 54971 will be sold to another company.

Soon you will receive a letter from the Company describing any severance benefits you may have available under the collectively bargained labor agreement.

I would like to take this opportunity to thank you all for your past efforts on behalf of the Company and, also wish each and every one the best for you in the future.

If you have any questions please be sure to ask. We would like this transition to be as smooth as possible.

GC Ex. 13. As Bayer's reference to severance benefits suggests, all RSI employees were to be terminated as of May 15. However, Francisco's notice invited the employees of RSI to apply for employment with FFI:

Tom and I are in the process of negotiating the purchase of Piggly Wiggly. We are both very excited about the prospect of owning the store.

We anticipate that there will be a number of restructuring and reorganization changes made here at the store.

Everyone who is presently employed now should please consider reapplying for employment at our store. By law, anyone interesting in working for Francisco Foods Inc. must fill out a new application.

GC Ex. 12.

In the weeks following the announcement of the forthcoming sale, Francisco had a number of conversations with store personnel regarding her intent vis a vis the Union. According to these individuals, although Francisco allowed for the possibility that the new employees might opt for Union representation, she

did not plan to recognize the bargaining unit at the outset of her tenure as store owner:

1.    As we noted above, Francisco on March 15 had purportedly told Ritchay--who was offered but did not accept a job with FFI--that "it wouldn't be a union . . . ." Tr. 432-33. According to Ritchay, a couple of days later, Francisco qualified that remark by saying that "there wouldn't be a union, but if the employees wanted a union--the new employees wanted a union they could vote on it," Tr. 433. Ritchay testified that he subsequently told Francisco "if [fellow RSI employee] Bob Schumacher is going to be out there picketing that I wouldn't be able to cross the line." Tr. 434. His conversation with Francisco "kind of went back and forth," Ritchay testified, and then "I kind of mentioned that you know Bob really wants the Union in here. She says that's not going to happen." Tr. 435.

2.    According to RSI utility employee Adam Simonis-- whom FFI hired--Francisco said to him between one and two weeks after the sale was announced that "she was going to let the employees decide whether or not they wanted" a union rather than recognizing the Union "right away." Tr. 497.

3.    Bakery/deli manager Schrader--whom FFI also hired-- testified that Francisco likewise told her that she did not then intend to recognize the Union, but "[f]urther down the road if the employees wanted the union, you know, then she would go from there." Tr. 341.

4.    RSI employee Cari Wittchow likewise testified that when Francisco approached her a week or two after the sale was announced and offered her a job with FFI, Francisco mentioned that "she didn't want to acknowledge [the Union] at that time," Tr. 490, and that it would be up to FFI employees to decide whether they wished to be represented by the Union, Tr. 492.

5.    Evonne Everson gave a written statement to the Union (dated April 6) stating that on or about March 24, she had asked Francisco whether FFI would hire all of RSI's employees. According to Everson's statement, Francisco "stated only 50% of the employees [would be hired,] because she wouldn't have the Union. Pam Francisco stated that she couldn't have the Union because she couldn't afford it." GC Ex. 29. Francisco subsequently hired Everson just days before FFI assumed ownership of the store. At the hearing before the ALJ, Everson identified her written statement but claimed it was inaccurate. Tr. 279-81. "I didn't write this right," she said. Tr. 303./2

Although Francisco denied making most of the remarks attributed to her by store employees, e.g., Tr. 638, 640, 645, 646, 647-48, 649-50, 655-66, she concedes that she told staff that she "would not recognize the union automatically and [she] felt that it should be an employee decision." Tr. 646; see also GC Ex. 33 at 1.

In mid-April 1999, FFI began to run advertisements in four local newspapers for numerous positions at the Piggly Wiggly; and on April 21, 1999, Francisco began to interview candidates for hire by FFI.

Francisco made offers to many, but not all, of the RSI employees who wished to stay on at the store. Thirty-four of RSI's employees sought either supervisory or non-supervisory positions with FFI. Francisco ultimately hired three RSI employees for supervisory roles and extended offers of employment to another twenty RSI employees for non-supervisory positions.

As April gave way to May, however, a number of positions with FFI remained unfilled, and a number of RSI employees who had applied for jobs with FFI had not yet been told whether or not FFI planned to hire them. On May 11, 1999, just five days before FFI took over the store, the following language began to appear in FFI's hiring advertisements in the local papers:

No Experience Necessary
We Will Train You!!

GC Ex. 17. On the same date, Francisco telephoned the local police and informed them that she expected there to be as many as 200 people picketing in front of the store on May 16--the first day of store operations under FFI ownership. GC Ex. 26. Francisco could not recall having telephoned the police, Tr. 189-91, but when confronted with a police log documenting the fact and substance of the conversation, she allowed that "[i]f they say I did," she might have placed the call. Tr. 190.

Meanwhile, in the weeks immediately preceding FFI's takeover of the store, Francisco allegedly had a number of additional conversations with RSI employees that again touched upon the prospective status of the Union with FFI. The testimony of these employees suggests that Francisco was making hiring decisions with an eye to avoiding an obligation to recognize the Union. (Again, Francisco denies the substance of these conversations.)

1.    Valerie Clark was an RSI employee who did not apply for work with FFI. However, her daughter Carrie--also an RSI employee--did seek employment with FFI. On May 1, 1999, Valerie Clark asked Francisco about her daughter's status. She testified as follows regarding her conversation with Francisco:

Q. Okay. And how did the conversation come about or where did it take place?

A. I approached her because I was in the store for other reasons and I saw her in aisle five working and I approached her and I asked her if she knew yet if Carrie would have a job when she took over.

Q. Did Ms. Francisco give you an answer?

A. Yeah. She said she did not know yet.

Q. Did she say anything else?

A. She said she had to be very careful and get rid of fifty percent of the workers and she would make a decision as to Carrie probably in the next week.

Q. When she talked about fifty percent of the workers did she say anything else that you recall?

A. She--when she said she had to get rid of fifty percent of the workers I made some goofy comment. I think I said, "Oh God, that's like about everybody." And she said this was not going to be a unioned [sic] store."

Tr. 393-94.

2.    Four days later, on May 5, Carrie Clark herself asked Francisco about her prospects.

Well, I asked her if she knew whether or not I was going to be rehired and she said she didn't know. She said I wasn't at the top of her firing list and if I were to reapply later on down the line that she would rehire me and she'd write me a good recommendation. She also said that she wasn't going to keep a lot of the students and there was going to be a lot of new faces because she wanted to keep the union out, but she told me that information was not supposed to leave the office.

Tr. 362.

3.    Head cashier Tina Warriner had worked at the Piggly Wiggly for twelve and one-half years. She testified that on or about May 8, she asked Francisco whether FFI would hire her. As Warriner recounted the conversation, Francisco commented that Warriner was "good in the front end" (i.e., good with customers) and had a strong attendance record, but "[her] downfall was the schedule." Tr. 252. (In addition to her other duties, Warriner prepared the initial draft of the weekly employee work schedule for Francisco's review and revision.) Francisco then proceeded to inquire whether Warriner, who was a Union steward, would be willing to work in a nonunion shop:

Well, when we were talking about if I had a job or not and she was telling me if--you know, that I did have a lot of good qualities out there and she would ask me how I could work for--if I could work for a nonunion store and I told her I had to get all my priorities in order but I probably could.

Tr. 253. Francisco did not tell Warriner whether she would be hired.

4.    Shortly after the sale of the store was announced, Francisco indicated to RSI meat wrapper Joe Curtis that if he wanted his job "back," he would have to complete an application. Tr. 542. Curtis testified twice on consecutive days before the ALJ. According to Curtis's initial testimony, Francisco went on to remark "that she could hire back 50 percent of each--in each department [but] if she took the union back, and which would have been--I would have been fired." Tr. 543. FFI's lawyer asked Curtis on cross-examination whether it might have been Paul Maxwell, the meat manager, who made the latter remark to him rather than Francisco. Curtis, however, was firm: "No, it was Pam." Tr. 545. Curtis testified that at a later date, Francisco informed him that she was able to hire him: "She said we can--now I'm able to work . . . ." Tr. 544. Curtis, incidentally, agreed that he was not a fan of unions. Id.

Notwithstanding his initial confidence that it was

Francisco, and not Maxwell, who had spoken of a fifty-percent hiring cap, Curtis was recalled to the stand by FFI on the following day to say that he had been mistaken. Tr. 581-82. Curtis testified that FFI's cross-examination on this point had started him wondering, and that after extensive reflection, he had decided that it was actually Maxwell who had mentioned the fifty-percent quota to him. Tr. 585. Once he came to this realization, Curtis explained, he had telephoned FFI's attorney at home to alert him to the mistake. Tr. 587-88. When asked on cross-examination how he had obtained the attorney's home telephone number, Curtis said that he had looked it up in the Ripon telephone directory. Id. It turned out, however, that FFI's attorney, James Macy, lived in Oshkosh, Tr. 589, and when Curtis was handed a copy of the local telephone directory and asked to locate Macy's number, he spent fifteen minutes trying to do so to no avail. Tr. 594-96. When asked to spell Macy's name, Curtis ventured a guess that was incorrect: M-A-S-A-S-E-Y. Tr. 593. Curtis eventually conceded that someone may have given him Macy's telephone number. Tr. 596./3

5. Night stocker Robert Schumacher was a longtime RSI employee to whom Francisco had extended a job offer. As FFI's takeover of the store approached, however, Schumacher grew concerned and frustrated about the fate of other RSI employees to whom Francisco had not yet extended offers. In early May, Schumacher summoned Francisco to the produce room of the store and, in front of RSI employee Pat Ritchay, confronted her with a series of questions about the impending takeover. According to Schumacher, when he asked Francisco why FFI did not simply hire all of RSI's employees, she told him that "she'd hire us all back if we would vote out the union." Tr. 412.

6. On May 1, Francisco interviewed Jamie Harttert, a college student, for a position with FFI. Harttert was not an employee of RSI. Harttert told Francisco that she viewed employment with FFI as "mainly a summer job" and that once her studies resumed in the autumn, she would only be able to work every other weekend. Tr. 481. Harttert testified that in response, Francisco "explained to me that under the union that people would have to work a certain amount of hours per week and that I wouldn't be able to do every other weekend under the union. But since she was changing it to a nonunion, that she, you know I could work every other weekend." Tr. 481. Francisco hired Harttert. According to Harttert, at a meeting for new employees that took place at least a week before FFI took over the store, Francisco warned them to expect picketing when they started work. Tr. 482-83.

As of May 12, 1999, four days before the change in store ownership took effect, seven RSI employees who had applied for jobs with FFI still had not been told whether they would be hired./4 Two of these people had long affiliations with the store: Janet Simmons had worked at the Piggly Wiggly for eleven years,/5 while Tina Warriner had worked there for twelve and one-half years. The remaining five were employees who had worked at the store for relatively short periods of time prior to the sale.

At approximately 4:00 p.m. on that day, Bob Schumacher led a delegation of eight RSI employees to Francisco's office to ask for the return of their job applications. Two of these

individuals, Schumacher and Penny Pipping--along with Pipping's husband Alan, who was not present--had received offers of employment from FFI. The other six individuals-- Tina Warriner, Robert Birkrem, Carrie Clark, Jamie Kotlowski, Ryan Sasada, and Janet Simmons--had not yet heard whether they would be offered a job with FFI. "[I]t [was] a situation where no one really knew whether they were hired or not or what kind of games [Francisco] was playing because everybody was being told one by one," Schumacher testified. Tr. 414-15. Anticipating that Francisco would not recognize the Union, Schumacher and Penny Pipping had decided to decline the offers they had received. At the same time, a rumor apparently had been circulating among RSI employees that none of them would be eligible for unemployment if they still had a job application pending with FFI. Wishing to preserve that eligibility, the eight members of the group asked Francisco to return their applications. Penny Pipping asked for her husband's application back as well. Francisco agreed to return all of the applications save that of Alan Pipping, who was not present, and went home to retrieve them. After unsuccessfully trying to locate the applications, Francisco returned to the store and promised the employees that she would bring them with her on the following day.

Separately on that same day, high school student and RSI employee Tara Manthei also asked Francisco to return her application. Manthei testified that she had asked Francisco about her prospects a week earlier, and that Francisco had told her she was "not on the top of the firing list." Tr. 532. However, Manthei's mother, Susan, had learned from someone who had seen a draft FFI work schedule that Manthei's name was not on it; and she therefore assumed that Francisco was not going to hire her daughter. Tr. 474, 533-34. Francisco returned the application to Manthei, who eventually discarded it./6

The Union held a meeting on the evening of May 12. Union officials were "flabbergasted" to learn about the withdrawals. Tr. 38. They proceeded to admonish RSI employees that it was a mistake for them to withdraw their job applications, because a pending application with FFI would not, in fact, disqualify them from receiving unemployment compensation in the event they were not hired. Officials told the employees who had withdrawn their applications to resubmit them.

On the following day, May 13, Francisco arrived at the store with the applications whose return had been requested. Penny Piping, Carrie Clark, and Jamie Kotlowski accepted their applications back and tore them up in front of Francisco. Alan Pipping, Ryan Sasada, and Janet Simmons each indicated to Francisco that she should keep his or her application. Tina Warriner, after receiving her application, returned it to Francisco's desk. Neither Robert Birkrem nor Bob Schumacher ever received his application from Francisco, and neither of them asked Francisco again for its return. None of these employees expressly told Francisco that they still wished to be considered for employment with FFI. Francisco testified that she was under the impression they were no longer interested: "Well, I assumed they didn't want jobs. They were pulling their applications." Tr. 641. None of these individuals subsequently received an offer of employment from FFI.

RSI ceased operations and closed several hours early on Saturday, May 15, and on the following morning, the Piggly Wiggly reopened under FFI's management./7 As of May 16, FFI had a complement of forty-five employees, excluding Francisco. Six of the forty-five employees were supervisors or managers; the remaining thirty-nine held non-supervisory positions. Of FFI's thirty-nine non-supervisory workers, sixteen had worked for RSI, whereas the other twenty-three were "new" hires. The six supervisors included three individuals who had formerly worked for RSI. Because the former employees of RSI constituted a minority of FFI's non-supervisory workforce, FFI neither recognized the Union nor assumed RSI's obligations under the collective bargaining agreement with the Union. The Union immediately commenced picketing of the Piggly Wiggly.

The fact that FFI hired most of its non-supervisory employees from outside of the RSI labor pool give rise to proceedings before the NLRB. On May 17, 1999, the Union filed a charge with the Board asserting that FFI had refused to hire a number of RSI's employees in order to avoid an obligation to recognize and bargain with the Union. R. 1 Ex. A. After investigating the charge, the Director, on August 30, filed the complaint we described at the outset of this opinion. Id. Ex. B. An administrative law judge conducted an evidentiary hearing on that complaint which concluded on October 1, 1999. On November 30, the Director petitioned the district court for interim injunctive relief. R. 1. The Director's request was submitted to the court along with the record of the evidentiary hearing before the ALJ.

The district court denied the Director's petition for two principal reasons. First, the court concluded that the Director had not shown that the Union faced irreparable harm in the absence of interim injunctive relief. Although the Director argued that the Union's status among store employees would erode while awaiting relief from the Board, the court characterized this as nothing more than speculation. R. 23 at 5. As the court viewed the record, FFI had not engaged in the kinds of unfair practices that would convey to employees an intolerance of Union activity or that would otherwise chill support for the Union. Id. at 5-6. The court pointed out that Francisco had invited applications from RSI's employees; had actively recruited several of those individuals, including one whom she knew to be an active Union supporter; had ultimately hired nineteen of the thirty-four RSI employees who sought employment with FFI; and had indicated to a number of store employees that unionization would be up to them. These facts revealed no propensity on the part of FFI to engage in coercive acts in order to evade an obligation to bargain with the Union. Id. at 6. At the same time, should the Board ultimately find in the Director's favor, the Union would be reinstated as the employees' representative, giving it the opportunity to re-establish support among store employees. Id. at 6-7.

Second, the court believed that the Director had no better than a negligible chance of prevailing on the merits of his complaint. In order to impose a duty on FFI to recognize and bargain with the Union, the Director would have to show both that FFI qualified as RSI's successor and that FFI had made discriminatory hiring decisions in order to avoid having a union-

dominated workforce. The court thought it likely that the Director would succeed on the first of these points: FFI, like RSI, operated a grocery store, sold similar products, and, like RSI, marketed those products primarily to consumers. Id. at 8-9. But the court did not think it likely that the Director would convince the Board that FFI's hiring decisions were discriminatory. FFI had conducted an open hiring process and had invited RSI's employees to apply for jobs with FFI; Francisco had recruited a known Union advocate along with several other RSI employees; and FFI had extended offers to all but eleven of the thirty-four RSI employees who had submitted applications. Id. at 11. All of the eleven RSI workers to whom FFI did not offer jobs, the court explained, "had demonstrated legitimate performance or employability concerns." Id. at 11. Four of them had problems in their work histories. Id. at 11 n.17. The remaining seven were among the ten RSI employees who had asked Francisco to return their applications on May 12. Id. at 11-12. In doing so, those seven employees had genuinely put their interest in employment with FFI, and their desirability as prospective hires, into doubt. Id. at 12. Consequently, even if the Director were able to prove that anti-union animus played a role in Francisco's hiring decisions, the court was convinced that FFI would still be able to show that it wouldn't have hired the eleven individuals to whom it did not extend offers for legitimate, non-discriminatory reasons. Id. at 12-13.

Nearly two months after the district court denied the Director's petition for interim relief, the ALJ who heard the Director's complaint issued an order which concluded, in relevant part, that FFI had declined to hire certain RSI employees in order to avoid having to recognize and bargain with the Union. Francisco Foods, Inc. and United Food & Commercial Workers Union, Local No. 73A, AFL-CIO, No. 30-CA-14738 (N.L.R.B. Div. of Judges Mar. 31, 2000) (hereinafter, "ALJ Decision")./8 The ALJ found that the Director's witnesses had credibly testified to a variety of statements by Francisco to the effect that FFI did not plan to recognize the Union, and that she was making hiring decisions in such a way as to keep former RSI employees in the minority of FFI's workforce so as to avoid a duty to recognize and bargain with the Union. Id. at 13-14. Consistent with those statements, the ALJ went on to find, Francisco had purposely delayed action on the employment applications of a number of RSI workers:

The employees of the Bayers were treated like puppets on a string. Francisco didn't want to recognize the union and refrained from offering jobs to employees of the Bayers until she was sure that less than a majority of Respondent's employees would be former employees of the predecessor. At the same time employees are waiting to see if they had a job Francisco is advertising for employees and advising prospective employees that no experience is required.

Based on the entire record it is crystal clear to me and I believe would be to anyone who saw and heard the witnesses in this case that to avoid successorship status Respondent did not hire a number of employees.

Id. at 14 (emphasis in original).

Against this backdrop, the ALJ did not find it fatal to the

Director's case that ten RSI workers had asked Francisco to return their applications on May 12. The ALJ concluded that FFI was not going to hire seven of these individuals in any event. One of them, Tara Manthei, had already learned (through her mother) that she would not be hired. The return of her application, therefore, was merely a nod to the inevitable. Id. at 14, 16. Six other employees had still not been told whether FFI planned to hire them, notwithstanding the fact that FFI's takeover of the store was just days away. "Again, puppets on a string." Id. at 14. Although the applications of these six employees nominally remained under consideration, the evidence suggested to the ALJ that Francisco was not going to hire them. On the day prior to the withdrawals, Francisco had telephoned the Ripon police to inform them that she expected up to 200 picketers when the store reopened under FFI ownership on May 16. Because the Union would have no reason to picket the store if a majority of FFI's workforce were former RSI employees-- thus obligating FFI to recognize the Union--the ALJ construed Francisco's telephone call as confirmation that Francisco had no intent to extend offers to the six individuals who, as of the time they withdrew their applications, had not yet been told whether or not FFI would hire them. Id. at 15. Accordingly, the ALJ found it appropriate to treat these six individuals, along with Manthei, as victims of discrimination:

To hold it against Birkrem, Clark, Kotlowski, Manthei, Sasada, Simmons, and Warriner that they withdrew their applications and [to say that they] weren't hired for that reason when they had no chance to be hired in any event would be horribly unfair.

Id. at 15.

The ALJ also emphasized that six of the ten employees who had asked for their applications back had effectively reversed their requests. Id. at 15. Several individuals returned their applications to Francisco; others never received their applications back from Francisco and did not ask her again to return them. Id.

Three of the employees who asked for their applications back, however, had ripped them up in Francisco's presence. On the face of things, these three employees had taken themselves out of the running for positions with FFI. Yet, in the ALJ's view, FFI had "forced [these employees] into an untenable position" by making its hiring decisions in such a way as to avoid having to recognize the Union. Id. at 16. (The same was true of Tara Manthei, who had asked for her application back--and kept it-- only after her mother learned that Manthei would not be hired. Id.)

Even if these three individuals were removed from analysis, the ALJ pointed out, the evidence still supported the Director's claim that FFI had refused employment to a number of RSI employees in order to avoid a union-dominated workforce. Had FFI hired the other seven individuals who had asked for their applications back, twenty-three of FFI's thirty-nine non-supervisory employees would have been former employees of RSI. "In other words, a clear majority would [have been] employees of [FFI's] predecessor." Id. at 16.

In terms of the kind of business that FFI conducted, the ALJ had no doubt that the new company qualified as RSI's successor:

The facts in this case show a "substantial continuity" between the predecessor and successor employers. Respondent operates a Piggly Wiggly franchise grocery store at the same location as the predecessor, utilizing the same equipment and facilities; attracts the same customers; offers basically the same product lines; employs supervisors who worked for the predecessor; and employs employees in the same working classifications and under the same working conditions as the predecessor.

Id. at 16.

In sum, the ALJ concluded that but for its discriminatory hiring decisions, FFI would have been obliged to recognize and bargain with the Union. He therefore ordered FFI, inter alia, to offer jobs to the ten employees who had withdrawn their applications and, on request, to recognize and bargain with the Union. Id. at 17-18.

II.

Section 10(j) of the National Labor Relations Act authorizes a district court to enter "just and proper" injunctive relief pending the final disposition of an unfair labor practices claim by the Board. 29 U.S.C. sec. 160(j). We review the district court's decision to grant or deny interim injunctive relief for abuse of discretion. NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1566 (7th Cir. 1996), cert. denied, 519 U.S. 1055, 117 S. Ct. 683 (1997).

The familiar factors that courts reference in weighing the propriety of preliminary injunctive relief in other contexts--the lack of an adequate remedy at law, the balance of potential harms posed by the denial or grant of interim relief, the public interest, and the petitioner's likelihood of success on the merits of its complaint--apply to requests for relief pursuant to section 10(j) as well. Kinney v. Pioneer Press, 881 F.2d 485, 490 & n.3, 493 (7th Cir. 1989); see also Electro-Voice, 83 F.3d at 1566. Thus, the Director will be entitled to interim relief when:

(1) the Director has no adequate remedy at law;

(2) the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction;

(3) "public harm" would occur in the absence of interim relief;

(4) the Director has a reasonable likelihood of prevailing on the merits of his complaint.

Id. at 1567-68. The Director bears the burden of establishing the first, third, and fourth of these circumstances by a preponderance of the evidence. Id.

The strength of the Director's case on the merits affects the court's assessment of the relative harms posed by the grant or denial of injunctive relief: the greater the Director's

prospects of prevailing are, the less compelling need be his showing of irreparable harm in the absence of an injunction. Id. at 1568. But, in evaluating the likelihood of success, it is not the district court's responsibility, nor is it ours, to rule on the merits of the Director's complaint; that is the Board's province. The court's inquiry is confined to the probability that the Director will prevail. See id. at 1570.

In making this assessment, we must keep in mind that the district court rejected the Director's petition for relief under section 10(j) based solely on the written record of the evidence presented before the ALJ. The district judge heard no testimony himself, and consequently had no occasion to assess the credibility of witnesses or to resolve conflicts in the evidence. Under these circumstances, we owe the Director a favorable construction of the evidence, much as we would if he were a plaintiff appealing the grant of summary judgment in favor of the defendant. See Kinney, 881 F.2d at 489; see also Electro-Voice, 83 F.3d at 1566 n.15. We will therefore credit the Director's factual averments so long as they are plausible in light of the record evidence. See Electro-Voice, 83 F.3d at 1570./9

We must also bear in mind that it is the Board, and not this court, which is principally charged with the administration and enforcement of the Act. See United States v. Palumbo Bros., Inc., 145 F.3d 850, 861 (7th Cir.), cert. denied, 525 U.S. 949, 119 S. Ct. 375, 376 (1998). If and when we are called upon to review the Board's final order in this case, we will owe the Board's judgment considerable deference. E.g., Multi-Ad Servs., Inc. v. NLRB, 255 F.3d 363, 370-71 (7th Cir. 2001). In view of our limited role, and given the Board's expertise in matters of labor relations, we must be "hospitable" to the General Counsel's view of the law. Miller v. California Pacific Med. Ctr., 19 F.3d 449, 460 (9th Cir. 1994) (en banc), quoting Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union, 494 F.2d 1230, 1245 (2d Cir. 1974) (Friendly, J.); see also Pattern Makers' League of N.A., AFL-CIO v. NLRB, 473 U.S. 95, 114, 105 S. Ct. 3064, 3075 (1985); Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S. Ct. 1842, 1849 (1979); NLRB v. Manitowoc Eng'g Co., 909 F.2d 963, 971 n.10 (7th Cir. 1990), cert. denied sub nom. Clipper City Lodge No. 516 v. NLRB, 498 U.S. 1083, 111 S. Ct. 954 (1991).

Finally, although we do not sit in review of the ALJ's decision--which the parties have cross-appealed to the Board--his opinion is nonetheless relevant to the propriety of section 10(j) relief. Assessing the Director's likelihood of success calls for a predictive judgment about what the Board is likely to do with the case. The ALJ is the Board's first-level decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed. See, e.g., Hoffman v. Inn Credible Caterers, Ltd., 247 F.3d 360, 367 (2d Cir. 2001); Silverman v. J.R.L. Food Corp., 196 F.3d 334, 337-38 (2d Cir. 1999) (per curiam); Rivera-Vega v. ConAgra, Inc., 70 F.3d 153, 161 (1st Cir. 1995); Seeler v. Trading Port, Inc., 517 F.2d 33, 37 n.7 & 40 n.11 (2d Cir. 1975).

With these principles in mind, we turn to the Director's case, considering each of the elements set forth above. We begin with the Director's likelihood of prevailing on the merits of his

complaint against FFI.

A.  Likelihood of success

One of the prospects that confronted FFI when it decided to acquire the Ripon Piggly Wiggly franchise from RSI was the potential obligation, as RSI's successor, to bargain with the Union. The Supreme Court has recognized that when "[a] new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from [its] predecessor," it must bargain with the union that represented the predecessor's employees. Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 41, 107 S. Ct. 2225, 2234 (1987); see also NLRB v. Burns Int'l Security Servs., Inc., 406 U.S. 272, 280-81, 92 S. Ct. 1571, 1578-79 (1972). When FFI opened for business, only a minority of its non-supervisory employees (sixteen of thirty-nine) formerly had worked for RSI./10 Nominally, then, it had no obligation to bargain with the Union. It is the Director's theory, however, that FFI made its hiring decisions in a calculated manner aimed at ensuring that the former employees of RSI did not constitute a majority of the FFI workforce. Of course, FFI bore no obligation to hire any of RSI's employees. Fall River, 482 U.S. at 40, 107 S. Ct. at 2234, citing Burns, 406 U.S. at 280 & n.5, 92 S. Ct. at 1578 & n.5. Yet, FFI was not free to make discriminatory hiring decisions with the purpose of avoiding a duty to bargain with the representative of RSI's workforce. Ibid.

Of course, it is an unfair labor practice for an employer to discriminate in hiring or retention of employees on the basis of union membership or activity under sec. 8(a)(3) of the National Labor Relations Act, 29 U.S.C. sec. 158(a)(3). Thus, a new owner could not refuse to hire the employees of his predecessor solely because they were union members or to avoid having to recognize the union.

Howard Johnson Co. v. Detroit Local Join Executive Bd., AFL-CIO, 417 U.S. 249, 262 n.8, 94 S. Ct. 2236, 2243 n.8 (1974). That is precisely what the Director believes that FFI did in this case; and in doing so, he asserts, FFI violated not only section 8(a)(3) but also section 8(a)(5) of the Act. Section 8(a)(3) bars an employer from making discriminatory employment decisions in order "to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. sec. 158(a)(3). Section 8(a)(5) provides that an employer commits an unfair labor practice when he "refuse[s] to bargain collectively with the representatives of his employees . . . ." 29 U.S.C. sec. 158(a)(5).

To prevail on the merits of his complaint, the Director will have to prove two key propositions. Preliminarily, he will have to establish that FFI is RSI's successor--that is, that FFI has made "a conscious decision to maintain generally the same business" as RSI. Fall River, 482 U.S. at 41, 107 S. Ct. at 2234. Second, because only a minority of FFI's employees formerly worked for RSI, the Director will have to prove that FFI refused to make job offers to a number of RSI employees in order to keep former RSI employees in the minority and thus avoid the duty to bargain with the Union. See id. at 40, 107 S. Ct. at 2234. For purposes of the request for interim injunctive relief, the Director must demonstrate that his chances of proving these

points are "better than negligible." Electro-Voice, 83 F.3d at 1568.

1.

FFI contends for a variety of reasons that there is no substantial continuity of enterprise between RSI and FFI. First, FFI's organizational structure differs from RSI's in a number of respects: department heads have been given more supervisory authority, including the right to hire, discipline, and terminate employees (Tr. 83, 617); positions have been created for a customer service manager, a maintenance manager, and a bookkeeper, none of which existed under RSI's ownership (Tr. 167, 629-30); new job descriptions have been written (Tr. 627-28); and employees have been cross-trained so that they can handle a variety of assignments (Tr. 167, 629). Second, FFI has stopped using some of RSI's vendors and has begun using others that RSI had not used. Tr. 631-32. Third and finally, FFI has purchased new equipment (including checkout equipment and thermal printers) and changed its way of doing business to the extent that it no longer maintains handwritten customer accounts. Tr. 630-31. The record also reveals certain other changes: the store's floral department has been eliminated (Tr. 631); its offering of bakery goods has expanded (Tr. 618-19); and in general Francisco is attempting to update the store (Tr. 618).

These changes notwithstanding, we think it likely that the Board will find there to be a substantial continuity between RSI and FFI. The continuity assessment takes into account several factors, including "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers." Fall River, 482 U.S. at 43, 107 S. Ct. at 2236. These factors tilt rather strongly in favor of a finding of substantial continuity. FFI operates the same Piggly Wiggly grocery store that RSI did. There was virtually no hiatus between RSI's departure as the owner and FFI's assumption of control. Cf. id. at 45, 107 S. Ct. at 2237. With the exception of the new positions that FFI has created, FFI employees appear to be performing largely the same tasks, under comparable conditions, and under a number of the same supervisors, as RSI employees did; they are simply doing it under new ownership. Obviously the basic nature of the products that the store sells has not changed--notwithstanding the changes in FFI's vendors-- nor has the store's customer base. Given these material similarities between the two enterprises, it is highly likely that the Director will succeed in providing that FFI is RSI's successor. See R. 23 at 8-9.

2.

The critical question, then, is whether the hiring decisions that FFI made with respect to RSI workers were motivated by a desire to avoid having to bargain with the Union. See R. 23 at 9. An employer's motive is a factual matter which, like any other fact, may be proven by direct or circumstantial evidence. U.S. Marine Corp. v. NLRB, 944 F.2d 1305, 1315 (7th Cir. 1991) (en banc), cert. denied, 503 U.S. 936, 112 S. Ct. 1474 (1992). The

Director may establish that FFI acted with an unlawful motive by presenting substantial evidence that the company harbored an anti-union animus; that it lacked convincing reasons not to hire RSI's employees; that it made inconsistent hiring decisions or engaged in other conduct evincing a discriminatory motive; and/or that FFI staffed its store in such a way as to preclude former RSI employees from forming a majority of the FFI workforce. See id. at 1316-19. If the Director succeeds in establishing that FFI's hiring decisions were motivated by an anti-union animus, the burden shifts to FFI to prove that irrespective of that animus, it would have turned away the RSI employees that it refused to hire for legitimate reasons. Electro-Voice, 83 F.3d at 1568. The district court found that the Director's chances of prevailing on this aspect of its case were no more than negligible. R. 23 at 10-13. Having reviewed the record, however, we conclude that the Director's prospects are much better than that.

To begin with, reading the record favorably to the Director, FFI signaled repeatedly during the two-month period between the announcement and the completion of the sale that it did not plan to bargain with the Union when it assumed ownership of the store. According to Withers, when he and Francisco spoke on March 15, Francisco told him that FFI did not intend to recognize the Union, although she might "let [her] new employees decide what to do." GC Ex. 4. When Withers asked Francisco whether the reference to her "new employees" meant that she did not plan to retain the employees of RSI, Francisco confirmed that she was "not going to keep the bargaining unit." Id. That same day, Francisco allegedly told another employee, assistant store manager Michael Ritchay, that "it wouldn't be a union"--a remark that Francisco later qualified, according to Ritchay, by saying that the new employees could vote for union representation if that was what they wanted. Tr. 432-33. RSI employees Joann Schrader and Adam Simonis testified that Francisco likewise remarked to them she did not plan to recognize the Union at the outset, but that FFI employees could always vote in favor of union representation. Tr. 340, 497. Indeed, Francisco herself acknowledges having told store employees that she would not recognize the Union automatically but instead would leave the decision up to her employees. Tr. 646. Even FFI's attorney candidly wrote to Withers on March 16 stating that "the Company does not anticipate assuming the collective bargaining agreement." GC Ex. 5; see also GC Ex. 33 at 1. At least one week before the store changed hands, Francisco allegedly told Jamie Harttert and other newly hired individuals to expect picketing when they began work. Tr. 482-83. And on May 11, Francisco telephoned local police to inform them that she expected picketing in front of the store when FFI assumed ownership on May 16. GC Ex. 26. All of this suggests that FFI never intended to have a workforce dominated by the union-affiliated employees of RSI. Even Francisco's allowance that she might let her employees decide about union representation is telling, for if a majority of FFI's hires had been RSI employees, the company would have had no choice but to recognize and bargain with the Union. See Eldorado, Inc., 335 NLRB No. 76, 2001 WL 1083271, at *6 n.4 (Aug. 27, 2001); Bay Area Mack, 293 NLRB 125, 125 & n.5 (1989).

In addition to these signals, of course, there are other remarks attributed to Francisco indicating that she was

determined to keep former RSI employees in the minority in the FFI workforce. According to the written statement of RSI employee Evonne Everson, Francisco told her that she planned to hire only fifty percent of RSI's employees, "because she wouldn't have the Union." GC Ex. 29. When Valerie Clark inquired about her daughter's prospects for employment with FFI, Francisco allegedly told her "she had to be very careful and get rid of fifty percent of the workers . . . ," Tr. 393-94, because "this was not going to be a unioned store." Tr. 394. Carrie Clark herself later spoke with Francisco and purportedly was told that "there was going to be a lot of new faces because she wanted to keep the union out." Tr. 362. When RSI cashier and Union steward Tina Warriner inquired about the chances of FFI hiring her, Francisco, according to Warriner, complimented her on her attendance and her positive interaction with store customers, but asked her whether she was willing to work "for a nonunion store." Tr. 253. Francisco told meat wrapper Joe Curtis, according to Curtis's initial testimony, that she was able to take back fifty percent of the employees from each department, but that if she "took the union back," he would be fired. Tr. 543. And when stocker Robert Schumacher asked Francisco why she didn't simply hire all of RSI's employees, Francisco, according to Schumacher, replied that she would be willing to do so "if we would vote out the union." Tr. 412. If one credits this testimony (as the ALJ ultimately did), one can readily infer that Francisco conducted the hiring process with the paramount goal of keeping the percentage of former RSI employees below the fifty percent mark, so that FFI would not be obligated to deal with the Union. And if one credits the testimony regarding Francisco's remarks about the picketing she expected when the store reopened under FFI ownership, one can reasonably infer that Francisco fully intended to meet that goal.

There is, in short, ample evidence that FFI's hiring decisions were animated by an intent to avoid a duty to recognize and bargain with the Union. The remarks that the Director relies upon amount to direct, rather than circumstantial evidence of an anti-union animus, see generally Venters v. City of Delphi, 123 F.3d 956, 972-73 (7th Cir. 1997), and in contrast to the stray remarks we often see in employment cases, e.g., Schaffner v. Glencoe Park Dist., 256 F.3d 616, 623 (7th Cir. 2001), Francisco's alleged statements reflect the thoughts of a decisionmaker regarding the very employment decisions that the Director has challenged. If credited, this evidence would raise a presumption that FFI used the hiring process to stack the deck against the Union and to avoid any obligation to bargain with it.

The district court acknowledged this evidence, R. 23 at 10, but emphasized other facts which, in the court's view, were inconsistent with the notion that FFI was discriminating against union members. Among other things, the court noted that all RSI employees were notified of change of ownership and encouraged to apply for employment with FFI; the hiring process in fact was open to all RSI employees; Francisco actively recruited several RSI employees, including one who was known to be a Union supporter; only eleven of the thirty-four RSI employees (including supervisors) who sought employment with FFI did not receive job offers; and it was undisputed that four of those eleven employees were not hired for legitimate, performance-related reasons. See R. 23 at 11 & n.17, 13 & n.21.

Certainly those circumstances are consistent with a hiring process untainted by discrimination, but by no means do they foreclose the possibility that FFI was choosing its employees so as to obviate the need to bargain with the Union when it took over the store. It was entirely possible for FFI to encourage and accept job applications from RSI workers, and indeed to hire a substantial number of RSI employees, and still avoid having to recognize the Union, so long as former RSI employees comprised less than half of its workforce. Proceeding in that fashion was arguably the smarter course if, indeed, FFI's goal was to displace the Union. Refusing to hire anyone at RSI would have been an obvious sign of discrimination and would have deprived FFI of employees with valuable experience. By instead following a more selective path, FFI might appear to be conducting the hiring process in a non-discriminatory manner, yet still achieve what the Director believes was its illicit goal. See ALJ Decision at 15.

In fact, the testimony of the Director's witnesses is entirely consistent with the latter scenario. Although Francisco invited RSI workers to apply for employment with FFI, both she and FFI's counsel indicated early on that FFI did not anticipate automatic recognition of the Union--an announcement which implicitly, but unmistakably, suggests that FFI expected most of its employees to be new, i.e., not from RSI's unionized workforce. Indeed, if the testimony and notes of Union official Grant Withers are believed, Francisco told Withers expressly that she would not be retaining the employees of RSI. Again crediting the Director's witnesses, Francisco then embarked on a careful course of picking and choosing among RSI's employees, all the while keeping in the forefront of her mind that RSI employees had to remain in the minority of FFI's workforce or FFI would have to bargain with the Union--a criterion that she mentioned to several RSI employees. Francisco's fidelity to the fifty-percent cap on RSI employees is arguably borne out by the fact that as FFI's takeover of the store approached in May, FFI still had not told a number of applicants from RSI, including two longtime store employees, whether they would be hired, even as FFI was placing the "No Experience Necessary" ads in the local papers in an effort to fill its remaining positions. When RSI head cashier Tina Warriner asked Francisco, one week before FFI assumed ownership of the store, whether she would have a job with FFI, Francisco was largely complimentary of her skills but was curious about whether Warriner would be willing to work "for a nonunion store." Tr. 253. One may reasonably infer from this evidence that Francisco was sitting on the applications of a number of RSI applicants, rather than rejecting them outright, so as to maintain the appearance of a non-discriminatory hiring process while ensuring, in the end, that less than fifty percent of FFI's hires were RSI workers./11

An important wrinkle in the Director's case is the fact Francisco did make offers to twenty RSI employees for non-supervisory positions with FFI./12 When FFI assumed ownership of the store, it did so with a complement of thirtynine non-supervisory employees. Had twenty of those employees been Union members, FFI would have been obliged to recognize the Union. As FFI sees things, then, the fact that FFI extended offers to twenty of RSI's non-supervisory employees is wholly inconsistent with the notion that the new company was attempting to dodge a

duty to bargain with the Union. The Director, on the other hand, suggests that Francisco likely was staggering her hiring decisions, keeping careful track of how many RSI employees accepted employment with FFI, so as to avoid the possibility of having a union-dominated workforce. We must point out, however, that the record does not fully disclose the chronology of the offers that Francisco made to RSI employees./13

Like the other facts that the district court highlighted, the fact that Francisco extended offers to twenty RSI workers for non-supervisory posts with FFI certainly is consistent with a hiring process untainted by any unlawful motive; but again we believe that the record leaves ample room for a contrary conclusion. There is, for example, evidence that Francisco was postponing action on the applications of some RSI workers, including two longtime employees of RSI whose credentials would have been well known to Francisco. Francisco's conversation with one of those two employees, Tina Warriner, suggests that Francisco was as concerned about her ability to work "for a nonunion store" as she was about Warriner's qualifications, Tr. 253, and that she may have been delaying action on the application for that reason. Similarly, when Francisco first spoke with meat wrapper Joe Curtis about his likelihood of being hired, she indicated that she would "fire" him if she were obligated to recognize the Union. Tr. 543. In a later conversation, however, Francisco told Curtis that "now" she could hire him. Tr. 544. That remark can be construed as evidence that Francisco was carefully timing her employment decisions, as the Director suggests. Francisco's conversation with Carrie Clark supports a similar inference. Francisco purportedly told Clark, a student worker, that "she wasn't going to keep a lot of the students and there was going to be a lot of new faces because she wanted to keep the union out," Tr. 362; but she also told Clark that if "[she] were to reapply later on down the line that [Francisco] would rehire [her]," id. Moreover, although the store opened on May 16 with a complement of thirty-nine non-supervisory workers, nothing in the record suggests that this number was ever written in stone. FFI, obviously, could hire as many employees as it wished. Indeed, for more than two months after it assumed ownership of the store, FFI continued to advertise for additional employees. See GC Ex. 17. Consequently, even if all twenty of the individuals who received job offers from Francisco had accepted them, it was not a foregone conclusion that they would have constituted more than fifty percent of FFI's employees./14 Francisco's many alleged references to the need to hire less than fifty percent union-affiliated workers suggest that she might have avoided that eventuality by hiring additional employees not affiliated with RSI. And Francisco's anticipation--announced to both Harttert (and other new hires) as well as the Ripon police-- that there likely would be large-scale picketing when the store opened under FFI management on May 16, suggests that she never made room for the possibility of a union-dominated workforce.

The fact that seven of the RSI applicants who had not yet received offers asked Francisco to return their job applications on May 12 presents a second wrinkle in the Director's case. Had one or more of these individuals received and accepted offers (along with, or in addition to the three other RSI workers who had already received offers but who likewise asked for their applications back), Union members might have constituted a

majority of FFI's workforce. The district court was of the belief that the withdrawals were important for two reasons. First, the withdrawals deprived FFI of the opportunity to actually make an employment decision with respect to the seven individuals who had not yet received offers. R. 23 at 11-12. This in turn rendered any assessment as to the company's intent vis a vis these individuals speculative. Id. at 11. It was unlikely, the district court added, that these individuals could show their withdrawals were precipitated by Francisco's allegedly discriminatory intent, because "none state that they were aware of any anti-union animus." Id. at 12. Second, the withdrawals in and of themselves constituted a legitimate, non-discriminatory reason for FFI not to hire these applicants and thus rebutted any inference of discrimination that might arise from other evidence. Id. In short, "[i]t was the employees' own action which legitimately put their interest and desirability in doubt." Id.

Although the withdrawals do complicate the Director's case, they do not impose an obstacle so great as to render his chances of prevailing on the merits negligible. The district court's assessment that FFI was "deprived" of the opportunity to make a decision with respect to these candidates not only overlooks the fact that several of the employees returned their applications to Francisco (in effect rescinding the withdrawals) but, more importantly, assumes that FFI had not already made its decision with respect to these employees. Perhaps FFI did have each of these applicants under active consideration and was willing to hire all of them even if it meant having to bargain with the Union. Yet, as we have already emphasized, there is a wealth of evidence permitting a contrary inference: (1) Francisco had told RSI employees and the Union from the start that FFI did not intend to recognize the Union automatically. (2) She allegedly told several individuals that she was taking care not to hire a staff comprised of more than fifty percent former RSI employees, so that FFI would not have to recognize the Union. (3) As of May 12, the date on which the withdrawals occurred and just four days before FFI assumed ownership of the store, FFI had still not told these seven employees whether they would be hired, even though two of them had worked at RSI for more than a decade. (4) On May 11, five days before FFI assumed ownership and one day prior to the withdrawals, FFI began to include the "No Experience Necessary--We Will Train You!" language in its newspaper advertisements. That language reasonably suggests that FFI was actively soliciting applications from outside of the RSI labor pool, even as the applications of seven RSI employees nominally were still under consideration. (5) Finally, before the withdrawals occurred on May 12, Francisco allegedly had already told new hires (at least one week before the takeover) and the local police (on May 11) that she expected picketing in front of the store on May 16. Arguably, Francisco would not have expected picketing, and would not have alerted the police to that possibility, unless she were confident that a majority of FFI's workforce would not be Union members and that she would therefore have no obligation to recognize the Union. All of this evidence, if credited, suggests that the rejection of some, if not all, of these seven applicants was a foregone conclusion. One may further infer from that same evidence that the employees who withdrew their applications believed they were all but certain to be rejected: (1) Francisco's unwillingness to recognize the Union was not only communicated to numerous RSI employees but was,

according to the Union business representative, openly discussed at the very first Union meeting called to discuss FFI's takeover of the store. Tr. 36. (2) No action had been taken on the job applications of these employees even as the reopening of the store under FFI was just days away. (3) These individuals withdrew their applications based on an erroneous belief that a pending job application might disqualify them from receiving unemployment benefits. It is at least a fair inference that they would not have been concerned about unemployment compensation unless they expected Francisco not to hire them. That is, in point of fact, the precise inference that the ALJ drew from the evidence. ALJ Decision at 8, 15.

With respect to the three individuals who had received offers of employment from FFI, the Director has a plausible argument that FFI constructively discharged them. Francisco had allegedly remarked to a number of RSI employees that FFI would be a nonunion store long before she hired a full complement of workers. Employees throughout the store were aware of those remarks, as we have noted. By allegedly making plain her discriminatory intent, Francisco put the Union members to whom she extended offers in the untenable position of forgoing employment or foregoing their right to representation by the Union. The Board, with our endorsement, has found similar facts to constitute a constructive discharge. See Canteen Co., 317 NLRB 1052, 1068 (1995), enf'd, 103 F.3d 1355, 1365-66 (7th Cir. 1997).

Even if these three individuals are excluded from the analysis, however, we are still left with the seven individuals who had not yet received offers. Had they been hired, these seven individuals would have been more than sufficient to place Union members in the majority of FFI's complement of employees. One may readily infer, then, as the ALJ in fact did, that but for FFI's allegedly discriminatory hiring decisions, FFI would have been obliged to recognize and bargain with the Union. See ALJ Decision at 16.

We conclude, in sum, that the Director has a better than negligible chance of establishing that FFI chose its employees so as to avoid any obligation to bargain with the Union. Although the evidence may permit the conclusion that FFI did not, in fact, discriminate against RSI applicants, there is ample evidence that FFI never intended to recognize the Union and made its hiring decisions accordingly. Indeed, given the direct, and rather extensive, evidence that Francisco was making hiring decisions so as to keep Union members in the minority among her employees, we rate the Director's chances of succeeding as strong.

Finally, although the ALJ did not decide whether any of Francisco's alleged remarks about the prospective status of the Union constituted violations of section 8(a)(1) of the Act, as the Director asserts, because these remarks are relevant to the asserted need for interim relief, we think it useful to point out that the Board repeatedly has found that comparable remarks indeed do run afoul of this provision. Section 8(a)(1) provides that it is an unlawful labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of their rights under the Act. 29 U.S.C. sec. 158(a)(1). As the Board has recognized, until a successor employer has hired its

entire complement of employees, it does not know how many of the unionized employees of its predecessor will be in that complement, and so it cannot know whether it will be obligated to recognize and bargain with the union. Thus, "[w]hen an employer tells applicants that the company will be nonunion before it hires its employees, the employer indicates to the applicants that it intends to discriminate against the [predecessor's] employees to ensure its nonunion status." Kessel Food Mkts, Inc., 287 NLRB 426, 429 (1987), enf'd, 868 F.2d 881 (6th Cir.), cert. denied, 493 U.S. 820, 110 S. Ct. 76 (1989). Remarks to this effect are deemed to be "blatantly coerc[ive]," in the sense that they discourage union-represented employees from seeking employment with the successor and in this way abet the successor's effort to avoid having to recognize and bargain with the union. Eldorado, Inc., supra, 2001 WL 1083271, at *1, quoting Advanced Stretchforming Int'l, Inc., 323 NLRB 529, 530 (1997), enforced in relevant part, 233 F.3d 1176 (9th Cir. 2000), cert. denied, 122 S. Ct. 341 (2001); see also Bay Area Mack, supra, 293 NLRB at 125 & n.5; Kessel Food Mkts., 287 NLRB at 429; State Distributing Co., 282 NLRB 1048, 1059 (1987). So, if Francisco told Michael Ritchay that the new store "wouldn't be a union," Tr. 432-33; if she told Joann Schrader that she might recognize the Union "down the road" but not right away, Tr. 340; if she told Evonne Everson that "only 50 percent of the employees [would be hired,] because she wouldn't have the Union," GC Ex. 29; if she told Carrie Clark that "there was going to be a lot of new faces because she wanted to keep the union out," Tr. 362; if she complemented Tina Warriner on her skills but queried whether Warriner could work "for a nonunion store," Tr. 253; if she told Joe Curtis that he would be fired if she were forced to take the Union back, Tr. 543; and if she told Robert Schumacher that "she'd hire us all back if we would vote out the union," Tr. 412, then Francisco signaled to RSI employees that she did not plan to hire enough of them to make recognition of the Union compulsory. To that extent, she engaged in coercive conduct that violated section 8(a)(1).


B.   Adequate Remedy at Law and the Balance of Harms

"Section 10(j) relief is an extraordinary remedy," Szabo v. P*I*E Nationwide, Inc., 878 F.2d 207, 209 (7th Cir. 1989) (internal quotation marks and citation omitted), reserved for "those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process," id. In assessing the propriety of interim relief in this case, we must focus on the collective bargaining rights of the store's employees and what belated relief may mean to the future exercise of those rights. Hoffman v. Inn Credible Caterers, Ltd., supra, 247 F.3d at 369; see also Electro-Voice, 83 F.3d at 1567, 1572. As summarized above, the Director has presented evidence which, if believed, indicates that FFI refused to hire a number of RSI employees so as to avoid a duty to bargain with the Union. Based on that evidence, the Director has asked for an order requiring FFI, inter alia, to offer employment to the RSI employees that FFI failed to hire and to recognize and bargain with the Union. We must consider whether, in the absence of the relief that the Director has requested, the right of store workers to organize, and to reap the benefits of collective bargaining, will be irreparably undermined. See id. at 1572-73;

Inn Credible Caterers, 247 F.3d at 369.

The district court was not persuaded that the Union faced the prospect of irreparable harm in the absence of interim injunctive relief. This was not a case like Electro-Voice, the court reasoned, in which there was "persuasive" and "egregious" evidence that the employer had committed unfair labor practices that had a chilling effect upon the union's efforts to organize. R. 23 at 5-6. On the contrary, FFI had solicited applications from all of RSI's employees; it had made offers to twenty non-supervisory RSI employees and three supervisors; and Francisco had actively recruited several RSI employees, including one who was an active Union supporter. Id. at 6. The court also noted that several FFI employees had acknowledged in testimony that they would be allowed to determine the matter of unionization themselves. Id. In short, "the alleged facts do not indicate that Francisco Foods has a propensity for coercive acts which would severely harm future Union efforts." Id. Even if FFI did engage in unfair labor practices, the court concluded, the Board had the ability to order FFI to bargain with the Union and to hire any employees who were improperly refused employment with FFI to be hired. Id. at 6-7.

In defense of these findings, FFI makes one point that we must address at the outset--that the Director put on no evidence of irreparable harm that will occur in the absence of an injunction, and that he necessarily failed as a consequence to carry his burden to establish such harm. We do not know why the Director chose not to make an independent case on irreparable harm, but we do not agree that the omission left the record devoid of evidence from which the prospect of an irreparable injury may be inferred. In appropriate circumstances, the same evidence that establishes the Director's likelihood of proving a violation of the NLRA may provide evidentiary support for a finding of irreparable harm. Pye v. Excel Case Ready, 238 F.3d 69, 74 (1st Cir. 2001). At the same time, as we mentioned at the outset, a strong showing as to the Director's likelihood of success will permit a weaker showing as to the balance of harms posed by the grant or denial of interim injunctive relief. Electro-Voice, 83 F.3d at 1568.

In this case, the Director presented relatively compelling evidence that FFI made a calculated decision to evade the obligation to bargain with the Union as RSI's successor by hiring only a minority of RSI's employees. As the Director points out, the harms posed to a union and its members in this situation are well-recognized. A union finds itself "in a peculiarly vulnerable position" in the transition from predecessor to successor. Fall River, 482 U.S. at 39, 107 S. Ct. at 2234. "It has no formal and established bargaining relationship with the new employer, is uncertain about the new employer's plans, and cannot be sure if or when the new employer must bargain with it." Ibid. The workers represented by the union face a similar vulnerability: "If the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union is subject to the vagaries of an enterprises's transformation." Id. at 39-40, 107 S. Ct. at 2234. Given the uncertainties that both the union and its members face during the transition, a successor's refusal to recognize the union or, as allegedly was

the case here, its refusal to hire a majority of the predecessor's employees so as to escape that obligation, inflicts a particularly potent wound on the union and its members. "Having the new employer refuse to bargain with the chosen representative of the[ ] employees [who worked for the predecessor] 'disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions.'" Id. at 49-50, 107 S. Ct. at 2239, quoting Franks Bros. Co. v. NLRB, 321 U.S. 702, 704, 64 S. Ct. 817, 818 (1944).

There can be little doubt that these oft-cited harms are presented here. If one credits the Director's evidence, FFI succeeded in displacing a union that had represented store employees for more than twenty-five years. It made no secret of its intent, declaring from the beginning of the transition that it would not recognize the Union when it assumed ownership of the store. Over the course of the hiring process, Francisco's stated goal of keeping RSI employees in the minority, her remark to Schumacher that "she'd hire us all back if we would vote out the union," Tr. 421, her remark to Curtis that he would have been fired if she had to take the Union back, Tr. 543, and her inquiry as to whether long-time cashier Warriner could work "for a nonunion store," Tr. 253, conveyed an unmistakable message that union representation jeopardized the hiring prospects of RSI employees. True, Francisco did allow for the possibility that FFI's employees might, at a later date, vote for union representation. But the successor's duty is to recognize and bargain with the union from the outset, not simply to permit a new vote on the matter. See Eldorado, Inc., supra, 2001 WL 1083271, at *6 n.4; Bay Area Mack, supra, 293 NLRB at 125 & n.5. It is difficult to construe remarks akin to "I may let my new employees decide what to do," GC Ex. 4, as support for the Union, when the remark simply highlights the successor's ongoing efforts to displace the "old" employees along with the union that represented them. Indeed, as we discussed in the previous section, many of Francisco's alleged remarks predicting that the Piggly Wiggly would not be a union store when FFI took over constitute coercive remarks in violation of section 8(a)(1) under Board jurisprudence. See supra at 41-42. The district court's finding that FFI had not engaged in coercive activity, R. 23 at 5-6, is therefore inconsistent with the record evidence.

In this setting, the remedial authority of the Board cannot entirely cure the harms that will occur in the interim. Although the Board can order FFI to "reinstate" any RSI employee that it refused to hire for inappropriate reasons, the reality is that the rejected employees are moving on to other jobs; as additional time passes, the likelihood that they will be interested in or able to accept a position with FFI lessens. See Electro-Voice, 83 F.3d at 1573. Meanwhile, the RSI employees whom FFI did hire are working without the advocacy of their chosen representative. Assuming that the Board ultimately orders FFI to bargain with the Union, such a forward-looking order cannot fully compensate the employees of FFI for the variety of benefits that good-faith collective bargaining with the Union might otherwise have secured for them in the present. Squillacote v. U.S. Marine Corp., 116 LRRM 2663, 2665 (E.D. Wis. 1984); accord Rivera-Vega v. ConAgra, Inc., 876 F. Supp. 1350, 1371 (D. P.R.), aff'd, 70 F.3d 153 (1st Cir. 1995). Indeed, the longer that the Union is kept out of the store and from working on behalf of FFI's employees, the less

likely it is to be able to organize and represent those employees effectively if and when the Board orders the company to commence bargaining. Electro-Voice, 83 F.3d at 1573. In sum, the district court's assertion that any wrong that occurred can be compensated by way of the Board's remedial authority "turns a blind eye to the effect of the passage of time." Id. More than two years have already passed since FFI assumed ownership of the store, and years more may pass before this case is finally resolved.

The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable. That loss, combined with the likelihood that the Board's ability to rectify the harm is diminishing with time, equals a sufficient demonstration of irreparable harm to the collective bargaining process. . . .

Id. (citation omitted).

On the other side of the ledger, a grant of interim relief will impose obvious burdens on FFI, albeit ones that are only cursorily noted by the company on appeal. See FFI Br. at 40. Reinstatement of the ten RSI applicants whom FFI did not hire[15] will likely cause some displacement among FFI's current employees, although we note that five of those ten employees had relatively short tenures with RSI, which makes it less likely that they would accept jobs if offered them at this date. Moreover, requiring FFI to bargain with the Union will effectively unionize FFI's workforce for the first time. This will certainly mark a significant change for the employees who never worked for RSI and consequently were not represented by the Union.

However, the Director has presented a strong case on the merits and has already secured a favorable ruling from the ALJ who conducted the merits hearing. The Director's case, and the ALJ's findings, both suggest that FFI displaced the Union as the representative of the store's employees by means of discriminatory hiring decisions. In other words, FFI dramatically shifted the status quo in its favor through illegal means. See Inn Credible Caterers, 247 F.3d at 369 ("By its own violation of the Act, [the successor] was able to hire a non-union workforce and thereby threaten to weaken severely, if not destroy, the power of the predecessor's employees to assert their collective bargaining rights."). The longer that the successor employer is permitted to benefit from a state of affairs that its own wrongdoing has brought about, the less likely it is that a final order in the Board's favor will be able to redress the wrongs that have been done and to restore the status quo ante. Electro-Voice, 83 F.3d at 1573. Restoration of that status quo is a vital means of preserving the Board's ultimate ability to provide meaningful redress for the wrongs alleged.

Given the Director's likelihood of prevailing on the merits, coupled with the recognized gravity of the harms posed to the collective bargaining rights of the store's employees, we find that the balance of the harms favors an award of interim relief. See id.

C. Public Interest

Congress authorized interim injunctive relief via section

10(j) as a means of protecting public rather than private interests. Szabo v. P*I*E Nationwide, Inc., supra, 878 F.2d at 209-10. The NLRA embodies a public policy that aims to foster the free flow of commerce by promoting the collective bargaining process and "protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. sec. 151. Thus, the interest at stake in a section 10(j) is "the public interest in the integrity of the collective bargaining process." Eisenberg v. Wellington Hall Nursing Home, Inc., 651 F.2d 902, 906-07 (3d Cir. 1981); see also Hirsch v. Dorsey Trailers, Inc., 147 F.3d 243, 247 (3d Cir. 1998); Asseo v. Pan American Grain Co., 805 F.3d 23, 28 (1st Cir. 1986). That interest is placed in jeopardy when the protracted nature of Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices. See Electro-Voice, 83 F.3d at 1574; see also Miller v. California Pacific Med. Ctr., supra, 19 F.3d at 460.

Given the nature of the unfair labor practices charged in this case and the evidence supporting the Director's allegations, interim relief would serve the public interest. If, as the Director alleges, FFI deliberately displaced the Union by refusing to hire RSI employees it otherwise would have hired, it committed violations that strike at the heart of the collective bargaining process. As we have discussed, while the parties await the final resolution of the Director's complaint, the likelihood of the Board being able to effectuate complete relief on that complaint is decreasing: RSI employees that FFI did not hire are scattering to other jobs, the RSI employees who were hired are left without the benefits of representation, and support for the Union is no doubt eroding. By halting this progression away from the status quo ante, interim relief will help to preserve the Board's remedial authority and in that way serve the collective bargaining process.

III.

We conclude that the district court abused its discretion in denying the Director's petition for interim injunctive relief pursuant to section 10(j). A thorough review of the record reveals that the Director has a better than negligible-- indeed, strong--likelihood of prevailing on the merits of his charge that FFI evaded what would otherwise have been its obligation to recognize and bargain with the Union by conducting a discriminatory hiring process. That likelihood is borne out by the ALJ's decision in favor of the Director. Interim relief in these circumstances is widely recognized as an appropriate and necessary means of preserving the Board's remedial authority. Interim relief will also serve the public interest by fostering the integrity of the collective bargaining process, which FFI's alleged wrongs sought to disrupt.

We therefore REVERSE the district court's judgment and REMAND with directions to grant the Director's petition for relief pursuant to section 10(j) and to enter an order requiring FFI to (1) extend offers of interim employment to Robert Birkrem, Carrie Clark, Jamie Kotlowski, Tara Manthei, Alan Pipping, Penny Pipping, Ryan Sasada, Robert Schumacher, Janet Simmons, and Tina

Warriner; and (2) upon request, recognize the Union as the bargaining representative of its employees and to engage in collective bargaining with the Union. The Director has requested that FFI also be ordered to rescind any changes in work conditions that it has unilaterally imposed on store employees since its takeover of the store. Rescission can be appropriate when it appears that the employer has improperly circumvented the collective bargaining process in order to alter working conditions. See, e.g., Rivera-Vega v. ConAgra, Inc., supra, 70 F.3d at 162. The Director has only identified two such changes here, however--a new health insurance plan and a tightening of vacation eligibility--without discussing how those particular changes, left in place pending a final remedial order, might impair the Board's ability to effectuate complete relief. See Director's Br. at 10, 38-40. On remand, the district court may entertain additional evidence and argument on this point and, in the exercise of its discretion, determine whether interim rescission of the changes is appropriate.

FOOTNOTES

/1 Paragraph 6.2j of the purchase and sale agreement entered into by FFI and RSI provided that, pending consummation of the sale, RSI would not extend any existing labor agreement with the Union or enter into any new agreement with the Union that contained a continuation clause or that would otherwise bind FFI. GC Ex. 11 at 11, para. 6.2j.

/2 After hearing the evidence, the ALJ credited Everson's written statement over her testimony. Francisco Foods, Inc. and United Food & Commercial Workers Union, Local No. 73A, AFL-CIO-CLC, No. 30-CA-14738, Decision (N.L.R.B. Div. of Judges Mar. 31, 2000) ("ALJ Decision") at 11 para. 3. "It is obvious to me, observing the demeanor of the witness and the fact that she now works for Respondent, that the truth is in Everson's statement on April 6 and not in her testimony before me." Id.

/3 Based in part upon the apparent discrepancies in Curtis's explanation as to how he had contacted FFI's attorney, the ALJ credited his original testimony. "Suffice it to say I believe it was Francisco and possibly also Maxwell who mentioned the 50% matter to Curtis. And Curtis was trying to undo some damage from his testimony the day before. I am convinced that the Respondent's counsel did nothing improper, however." ALJ Decision at 13.

/4 Four additional individuals had applied for, but had not yet been offered employment with FFI. However, after hearing the evidence, the ALJ found that FFI had legitimate, performance-related reasons not to offer these four individuals employment. ALJ Decision at 8-10. The Director does not quarrel with that determination here. Director's Br. at 10 n.7. Accordingly, we shall exclude these individuals from consideration.

/5 Simmons testified that she had asked Francisco a week or so after the sale was announced whether she would have a job with FFI. According to Simmons, Francisco responded simply, "I don't know." Tr. 456. Simmons went on: "I was going to walk away and then [Francisco] said, no wait a minute. And I went--I said that I had talked with other people in the store and she had told them

that they had a job and I would like to know, yes or no, whether I had a job or not, and she said, I don't know. And that's where I left it." Id.

/6 Francisco testified that she had not yet prepared a work schedule for FFI at this point in time. Tr. 653. Penny Pipping, however, testified that fellow employee Ryan Sasada had found the schedule and had shown it to her. Tr. 688-89. According to Pipping, with three exceptions, the new schedule was filled with the names of new employees. Tr. 688.

/7 Because May 16 was a Sunday, the sale did not actually close until the following day, May 17.

/8 We may, of course, take judicial notice of the ALJ's decision. See Rivera-Vega v. ConAgra, Inc., 70 F.3d 153, 157 n.3 (1st Cir. 1995); Seeler v. Trading Port, Inc., 517 F.2d 33, 37 n.7 (2d Cir. 1975).

/9 This court has declined to articulate any rule about the appropriate way in which to view the facts when evaluating a request for interim injunctive relief pursuant to section 10(j). See Electro-Voice, 83 F.3d at 1567 n.16; see also Kinney, 881 F.2d at 488-89. Our sister circuits often observe that the Director is entitled to a favorable construction of the evidence in this context. See, e.g., Hoffman v. Inn Credible Caterers, Ltd., 247 F.3d 360, 365 (2d Cir. 2001); Sharp v. Webco Indus., Inc., 225 F.3d 1130, 1134 (10th Cir. 2000); Arlook v. S. Lichtenberg & Co., 952 F.2d 367, 371-72 (11th Cir. 1992); Pascarell v. Vibra Screw, Inc., 904 F.2d 874, 882 (3d Cir. 1990). That observation is usually made, however, in the context of evaluating whether the Director has "reasonable cause" to believe that the employer has violated the NLRA. See Kinney, 881 F.2d at 488-89 & n.1. In Kinney, this court held that "reasonable cause" is not part of the 10(j) analysis. 881 F.2d at 488-93. "Once the Board seeks injunctive relief under sec. 10(j)," we concluded, "the only question for the court is whether the Board has demonstrated that relief is 'just and proper' under the approach traditionally applied to equitable cases filed by public agencies." Id. at 493 (footnote omitted). We do not decide here whether the Director is always entitled to a favorable construction of the evidence--even if, for example, the district judge has conducted a full-blown evidentiary hearing on the Director's application and resolved certain credibility questions or other conflicts in the evidence against him. See Kinney, 881 F.2d at 489. We decide only that when the district court decides the Director's request for 10(j) relief entirely on a paper record, we owe the Director a favorable reading of that record. See id.

/10 The successorship analysis necessarily focuses on non-supervisory employees, given that supervisors are excluded from the bargaining unit. See, e.g., NLRB v. Joe B. Foods, Inc., 953 F.2d 287, 294-97 (7th Cir. 1992).

/11 Indeed, the evidence supports the inference that Francisco's failure to tell employees whether or not FFI planned to hire them was a signal that offers would not be extended to them. None of the four RSI employees whom FFI rejected, according to the ALJ, for legitimate, performance-related reasons, ALJ Decision at 8-

10, was ever actually told that he or she would not be hired. See Tr. 246, 335, 557, 564. In fact, Francisco testified that when FFI decided not to hire someone, "[w]e didn't respond" to that individual's application. Tr. 619.

/12 Recall that sixteen of FFI's non-supervisory employees had formerly worked for RSI. Francisco had extended offers to four other RSI employees. Three of these individuals--Bob Schumacher, Penny Pipping, and Alan Pipping, were among the ten individuals whose applications Francisco was asked to return on May 12. The fourth employee, Peggy Koepsel, accepted a job elsewhere.

/13 The record does reveal that Francisco made job offers to a number of RSI employees fairly soon after the sale to FFI was announced. See Tr. 432-33 (Ritchay); Tr. 489, 492 (Wittchow); Tr. 496-97 (Simonis); see also Tr. 353-54 (Schrader). Indeed, it was the fact that others had already been promised a job with FFI that accounted for the frustration that Janet Simmons expressed to Francisco about her own uncertain status. Tr. 456.

/14 We should point out that one RSI employee, Evonne Everson, was hired just a day or two before FFI took over the store. See Tr. 278. By this time, Penny Pipping, to whom Francisco had extended an offer, had received her application back from Francisco and had torn it up. Arguably, then, Francisco knew when she hired Everson that Pipping was not going to accept a job with FFI and that, at most, nineteen of FFI's non-supervisory workers (just under one-half) would have been former employees of RSI.

/15 As we noted earlier, we are excluding from consideration the additional four applicants whom the ALJ determined were not hired for legitimate, performance-related reasons. See supra n.4.